JONATHAN SALLET (DC Bar No. 336198)
JUAN A. ARTEAGA (NY Bar No. 4125464)
PATRICIA BRINK (CA Bar No. 144499)
SCOTT SCHEELE (DC Bar No. 429061)
LAWRENCE FRANKEL (DC Bar No. 441532)
JARED HUGHES (VA Bar No. 65571)
CORY BRADER (NY Bar No. 5118732)
PATRICIA CORCORAN (DC Bar No. 461905)
MATTHEW JONES (DC Bar No. 1006602)
JONATHAN JUSTL (NY Bar No. 4928222)
DAVID LAWRENCE (CT Bar No. 430642)
ANNA SALLSTROM (CA Bar No. 300281)
U.S. DEPARTMENT OF JUSTICE
ANTITRUST DIVISION
450 5th Street N.W.
Washington, D.C. 20001
Telephone: 202-514-5621
Facsimile: 202-514-6381
E-mail: scott.scheele@usdoj.gov
*Additional Counsel Listed on Signature Page*

Counsel for Plaintiff,
UNITED STATES OF AMERICA

# UNITED STATES DISTRICT COURT
## FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA, | |
| Plaintiff, | Case No. 2:16-cv-08150 |
| v. | **COMPLAINT** |
| DIRECTV GROUP HOLDINGS, LLC and AT&T, Inc. | |
| Defendants. | |

1    The United States of America, by its attorneys acting under the direction of

2    the Attorney General of the United States, brings this civil antitrust action against

3    Defendants DIRECTV Group Holdings, LLC ("DIRECTV") and AT&T, Inc.

4    ("AT&T") to obtain equitable relief to prevent and remedy violations of Section 1

5    of the Sherman Act, 15 U.S.C. § 1.

6    ## I.    NATURE OF THE ACTION

7    1.    For almost 60 years, the Los Angeles Dodgers have been a beloved

8    professional sports team in Los Angeles ("LA").  During this time, LA Dodgers

9    fans have seen their team win five World Series championships, closely followed

10    the Hall of Fame careers of baseball greats such as Sandy Koufax and Tommy

11    Lasorda, and listened to the play-by-play calls of broadcast legend Vin Scully.  But

12    a significant number of Dodgers fans have had no opportunity in recent years to

13    watch their team play on television because overlapping and competitive pay

14    television providers did not telecast Dodgers games.  Those consumers were

15    deprived of a fair competitive process when DIRECTV unlawfully exchanged

16    strategic information with three competitors during their parallel negotiations

17    concerning carrying Dodgers games.

18    2.    This Complaint focuses on DIRECTV, the ringleader of information

19    sharing agreements with three different rivals that corrupted the Dodgers Channel

20    carriage negotiations and the competitive process that the Sherman Act protects.

1    DIRECTV was the one company that unlawfully exchanged information with

2    multiple rivals, and without it competition would not have been harmed and none

3    of the violations would have occurred.  Accordingly, the United States seeks

4    declaratory and injunctive relief against DIRECTV and its corporate successor

5    AT&T.

6         3.    In early 2013, SportsNet LA (the "Dodgers Channel"), a partnership

7    between the LA Dodgers and Time Warner Cable ("TWC"), acquired the exclusive

8    rights to telecast almost all live Dodgers games in the LA area.  Beginning in

9    January 2014, TWC offered various multichannel video programming distributors

10   ("MVPDs"),[1] including satellite pay television provider DIRECTV, the

11   opportunity to purchase a license to telecast the Dodgers Channel to their

12   customers in the LA area.  Distributing live local sports, like the Dodgers Channel,

13   is a significant characteristic of competition between MVPDs, because MVPDs

14   directly compete for subscribers who want to watch that content.

15        4.    During negotiations with TWC and as he prepared for those

16   negotiations, DIRECTV's Chief Content Officer, Daniel York, exchanged

17   information with his counterparts at Cox, Charter, and AT&T about their carriage

18   _____

19   [1] MVPD is an industry acronym standing for multichannel video programming
20   distributor, and it applies to a variety of providers of pay television services,
     including satellite companies (such as DIRECTV), cable companies (such as Cox
     and Charter), and telephone companies (such as AT&T).

3

plans for the Dodgers Channel.  These unlawful exchanges were intended to reduce each rival's fear that competitors would carry the Dodgers Channel, thereby providing DIRECTV and its competitors artificially enhanced bargaining leverage to force TWC to accept their terms.  Through each of these information sharing arrangements, Mr. York disclosed non-public information about the status of DIRECTV's negotiations with TWC and DIRECTV's future carriage plans and, in return, learned similar non-public information from each of these competitors.

5. The sharing of this competitively sensitive information among direct competitors made it less likely that any of these companies would reach a deal because they no longer had to fear that a decision to refrain from carriage would result in subscribers switching to a competitor that offered the channel.  As each company's contemporaneous business documents show, the elimination of this risk was valuable because each company identified a competitor's decision to telecast the Dodgers Channel as a significant development that could force it to reach a deal with TWC.

6. These competitor information exchanges took place against the backdrop of limited competition among pay television providers.  Most residential consumers in the LA area had a choice of only three or four pay television providers:  the incumbent cable company (like Charter, Cox, or TWC); the two

1   national satellite pay television providers (like DIRECTV) and sometimes a

2   telephone incumbent (like AT&T).

3          7.      Among the small group of competitors, DIRECTV stood apart.

4   Unlike its cable company rivals such as Cox and Charter, which have concentrated

5   geographic footprints within the LA area, DIRECTV directly competes for

6   subscribers with every MVPD in the LA area.  Consequently, DIRECTV—which

7   has sought to distinguish itself from other MVPDs by offering subscribers the

8   broadest range of live sports content—was more susceptible than other MVPDs to

9   pressure to reach a deal with TWC.  In addition, DIRECTV had the most

10  subscribers that could watch the Dodgers Channel on TWC.

11         8.      Conversely, as the largest direct competitor of every MVPD in the LA

12  area, a DIRECTV plan to carry the Dodgers Channel would have increased the

13  pressure on other MVPDs to do the same in order to avoid the risk of losing

14  subscribers to DIRECTV.  As one senior DIRECTV executive noted, with its

15  competitors "sit[ting] on the sidelines," the company was the "first domino in the

16  sequencing of deals."  This potential domino effect made DIRECTV a central

17  player in the Dodgers Channel negotiations.  Indeed, Cox, Charter, and AT&T all

18  viewed DIRECTV as the competitor whose decision to carry the Dodgers Channel

19  could force them to reach a deal with TWC, even if doing so meant paying a price

20  above the one targeted in their internal financial analyses.

9.     DIRECTV executives expressly acknowledged that they would be in a stronger bargaining position if DIRECTV's competitors stayed on the sidelines and did not launch the Dodgers Channel.  For instance, DIRECTV's CEO Mike White told Mr. York that he believed the distributors "may have more leverage if we all stick together" and Mr. York "[a]greed" that "others holding firm is key."  A DIRECTV content executive believed that TWC would "become more creative to improve [DIRECTV's] deal" as the rest of the industry was "waiting for us to launch."  In May of 2014, while the negotiating process was ostensibly proceeding, Mr. White spoke publicly—and proudly—about what DIRECTV had achieved, telling the audience for a large telecommunications and media industry conference that it was important that "the distributors start to stand together, like most of us have been doing in Los Angeles for the first time ever, by the way, with the Dodgers on outrageous increases and excesses."

10.     Mr. York—the DIRECTV executive who orchestrated these bilateral information sharing agreements—regularly communicated with his counterparts at Cox, Charter, and AT&T during their Dodgers Channel negotiations with TWC. Many of these communications occurred at important points in the negotiations with TWC, such as within days of each company receiving TWC's initial offer and when Mr. York and his counterparts were preparing to make recommendations to their CEOs.

11.     During some of these communications, Mr. York assured his counterparts at Cox, Charter, and AT&T that DIRECTV would not be launching the Dodgers Channel any time soon and received similar assurances.

12.     For example, when informed by Cox's senior content executive that TWC had indicated that it was close to reaching a deal with another MVPD, Mr. York told this executive that DIRECTV was *not* the MVPD that was supposedly close to signing a deal with TWC—which was important because DIRECTV was the largest competitor to Cox in Cox's LA service area.

13.     Mr. York and his counterpart at AT&T exchanged texts and voice messages that improperly discussed non-public information about their content negotiations and future plans, including the Dodgers Channel.  For example:

- In March 2014, AT&T's most senior content executive, who was in frequent contact with Mr. York, left Mr. York a voicemail:  "I had three things to catch up with you on, ah, two sports and one news."  A few days later, they spoke on the phone for twelve minutes.  That same AT&T executive recommended not launching the Dodgers Channel to AT&T's CEO the following day.

- Later that month, TWC told AT&T it was unlikely to lower its initial offer for Dodgers Channel carriage rights.  That same AT&T executive—who has referred to content offers as "pitches"—again texted Mr. York:  "Forgot to

7

1    tell you but we got a [##] mph pitch yesterday,"[2] and "Consistent with what

2    you got?"  Mr. York responded, "Hope u hit it out!"

3        14.    Mr. York and his counterpart at Charter also communicated at key

4    points in the Dodgers Channel negotiations.  During those communications they

5    shared non-public strategic information about their Dodgers Channel negotiations

6    and future plans for the channel.  For example, Charter's most senior content

7    executive recommended a Dodgers Channel strategy to his CEO for the first time

8    the day after a phone call with Mr. York.  The executive told the CEO he thought

9    Charter should "sit[] [the Dodgers Channel] out until at least if and when Direct

10   does a deal."  He testified that he based his recommendation on a "gut feeling"

11   rather than a formal financial analysis.  When a subordinate pushed back against

12   his choice of strategy, the executive declined to change course, explaining "I think

13   Direct will not be there at launch."  The Charter executive also texted Mr. York to

14   ask to speak with him the day that he and Charter's CEO met to set Charter's 2014

15   content budget, including for the Dodgers Channel.  Later in the negotiations, Mr.

16   York and the Charter executive spoke in person about "the high price that TWC

17   paid for the rights to SportsNet LA and was demanding for carriage."  The Charter

18

19   _____

20   [2] The actual price figures have not been included throughout the Complaint to
     protect competitively sensitive information.  The speed of the quoted pitch in this
     text matched the cents in TWC's offer to AT&T.

8

1   executive testified that they discussed that the price TWC offered their respective

2   companies for carriage was "outrageous."

3       15.     Based on these private communications and a series of public

4   communications, Mr. York and his counterparts at Cox, Charter, and AT&T knew

5   they were unlikely to lose subscribers to each other while they waited to carry the

6   Dodgers Channel.  For example, when Mr. York's counterpart at Charter

7   recommended that Charter delay launching the Dodgers Channel because "I think

8   Direct will not be there at launch," he explained that as a result there would be

9   "nowhere to get the games in [Charter's] markets."  Similarly, Mr. York assured

10   DIRECTV's CEO, Mr. White, that DIRECTV's competitors appeared "in no rush

11   to do a deal" for the Dodgers Channel, which was a "strategic consideration"

12   against DIRECTV launching the channel itself.

13       16.     The information that was exchanged as part of this scheme had an

14   anticompetitive effect on DIRECTV's and its competitors' decision-making about

15   whether to carry the Dodgers Channel.  DIRECTV's unlawful information

16   exchanges harmed competition by corrupting the competitive process that should

17   have resulted in each company making an independent decision on whether to

18   carry the Dodgers Channel, subject to competitive pressures arising from

19   independent decisions made by other, overlapping MVPDs.  Instead, key

20   competing executives knew that they were safer than they should have been under

9

a competitive process; safer because they had reason to believe that they would not lose subscribers to other MVPDs if they opted not to telecast Dodgers games. The information they shared was a material factor in their companies' Dodgers Channel decisions, with the effect of making each company less likely to reach a deal. The ultimate result: many consumers in LA had fewer—or no—means by which to watch the Dodgers Channel. DIRECTV's unlawful information exchanges harmed consumers by making it less likely that they would be able to watch Dodgers games on television and, in the TWC territory, on the MVPD of their choice.

17. DIRECTV and each of Cox, Charter, and AT&T, respectively, agreed to share forward-looking strategic information about the Dodgers Channel, and did share that information. Their information exchanges demonstrate their agreements and reflect concerted action between horizontal competitors.

18. DIRECTV's unlawful information exchanges with Cox, Charter, and AT&T concerning carriage of the Dodgers Channel lack any countervailing procompetitive benefits and should therefore be condemned as unlawful.

19. The United States, through this action, asks this Court to declare Defendants' conduct unlawful and to enjoin Defendants from sharing strategic competitive information with other MVPDs and their executives in order to prevent further harm to competition and consumers.

## II.    DEFENDANTS

20.    Defendant DIRECTV is a Delaware corporation with headquarters located in El Segundo, California, offering direct broadcast satellite service nationwide.  As of 2014, DIRECTV had approximately 1.25 million video subscribers in the LA area.  In 2015, Defendant AT&T acquired DIRECTV in a transaction valued at approximately $49 billion.

21.    Defendant AT&T is a Delaware corporation with headquarters located in Dallas, Texas.  AT&T is a multinational telecommunications company offering mobile telephone service, wireline Internet and television service, and satellite television service through its 2015 acquisition of DIRECTV.  AT&T offers wireline television service through its U-verse video product, which distributes video content using AT&T's telecommunications infrastructure.  Following its acquisition of DIRECTV, AT&T is now the largest pay television provider in the United States with more than 25 million video subscribers nationwide.  As of 2014, AT&T had approximately 400,000 video subscribers in the LA area.

## III.    JURISDICTION, VENUE, AND INTERSTATE COMMERCE

22.    The United States brings this action pursuant to Section 4 of the Sherman Act, 15 U.S.C. § 4, to obtain equitable and other relief to prevent and restrain Defendants' violations of Section 1 of the Sherman Act, 15 U.S.C. § 1.

23.    This Court has subject matter jurisdiction over this action under Section 4 of the Sherman Act, 15 U.S.C. § 4, and 28 U.S.C. §§ 1331, 1337(a), and 1345.

24.    This Court has personal jurisdiction over each Defendant and venue is proper in the Central District of California under 28 U.S.C. § 1391 and Section 22 of the Clayton Act, 15 U.S.C. § 22.  Each Defendant transacts business in this District.  Each Defendant provides pay television services to customers in this District and has substantial contacts in this District.  DIRECTV committed acts in furtherance of unlawful concerted action in this District.

25.    Both DIRECTV and AT&T are engaged in, and their activities substantially affect, interstate trade and commerce.  Each Defendant sells video distribution services throughout the United States to millions of consumers.  These sales substantially affect interstate commerce.  In 2014, U.S. consumers spent a total of about $26 billion on DIRECTV's video distribution services, and a total of about $6.8 billion on AT&T's video distribution services.  Each Defendant also purchases television content from numerous content providers in the flow of interstate commerce.  In addition, each Defendant's decision not to carry the Dodgers Channel substantially affected interstate commerce.  DIRECTV and AT&T could have acquired the right to offer the channel to thousands of subscribers outside of California, including subscribers in parts of Nevada and

1   Hawaii.  Moreover, each Defendant's decision not to carry the Dodgers Channel

2   affected the sale of advertisements on that channel to companies based outside of

3   California that would run during Dodgers games.

4        26.   AT&T is DIRECTV's successor in interest, including for purposes of

5   this action.  When AT&T acquired DIRECTV, it acquired all of DIRECTV's stock

6   (by merging DIRECTV into a subsidiary company wholly owned by AT&T), and

7   thereby acquired all of DIRECTV's assets.  AT&T proceeded to fully integrate

8   DIRECTV's operations into its own, with the result that DIRECTV's operations

9   have been continued within AT&T.  Additionally, the merger agreement did not

10   expressly limit AT&T's liabilities.  These circumstances indicate AT&T's intent to

11   assume DIRECTV's liability for these Sherman Act violations.

12        27.   The Chief Content Officer of AT&T negotiates and supervises the

13   negotiation of content agreements for DIRECTV, as well as for AT&T's other

14   video platforms.  These contracts may be negotiated across all AT&T's video

15   platforms; in fact, when AT&T acquired DIRECTV, it noted that the combined

16   companies' scale would give them greater leverage with content providers.  The

17   presence of AT&T is therefore necessary in order to effectuate the requested relief.

18

19

20

## IV.   DIRECTV UNLAWFULLY EXCHANGED INFORMATION WITH COX, CHARTER, AND AT&T WHEN NEGOTIATING CARRIAGE OF THE DODGERS CHANNEL

### A.   MVPDs Are Motivated to Seek Bargaining Leverage When Negotiating With Video Programmers

28.     MVPDs spend billions of dollars on sports content each year.  Over the years, MVPDs have complained about the rising cost of such content.  The desire to depress the cost of sports content—often a key component of competition between MVPDs—provides MVPDs a strong incentive to obtain bargaining leverage.  MVPDs may seek to unlawfully obtain bargaining leverage by engaging in collusive action designed to force sports content providers—such as TWC in this case—to accept different terms than they otherwise would in a negotiating process where MVPDs make carriage decisions independent of each other.  Such collusive activity harms competition by corrupting the competitive process and ultimately harms consumers by causing likely reductions in quality and output, as happened with respect to the blackout of the Dodgers Channel, which has now covered three baseball seasons.

14

**B.    TWC Successfully Employed a Divide and Conquer Strategy When Negotiating Carriage of the Lakers Channel**

29.    In 2011, TWC acquired the rights to locally telecast and distribute LA Lakers basketball games in the LA area.[3]  As it would later do with the Dodgers Channel, TWC launched a new regional sports network ("RSN") to serve as the exclusive channel telecasting these games (the "Lakers Channel").

30.    DIRECTV initially declined to carry the Lakers Channel, reasoning that TWC's asking price was too high and that it could negotiate a better rate than its smaller competitors if it held out.  However, TWC sought to increase the competitive pressure on DIRECTV, realizing that DIRECTV would be more likely to carry the Lakers Channel if its smaller competitors carried the channel because such a move would expose DIRECTV to the risk of losing subscribers to these competitors.  Accordingly, TWC approached the smaller MVPDs with a time-sensitive offer:  in exchange for an early agreement to carry the Lakers Channel, the smaller distributors would receive a size-insensitive most favored nation clause ("MFN") in their carriage agreements.  This clause would guarantee the smaller

---

[3] The Lakers ownership sold TWC the rights to telecast certain Lakers games to the local LA television market.  This type of local, team-based rights deal, exemplified in TWC's acquisition of the rights to both the Lakers and the Dodgers Channels, is distinct from the broadcasting deals negotiated by the leagues themselves, such as the NBA or MLB.  Those national deals convey the rights to broadcast a certain number of league games on nationwide networks, such as ESPN or the Turner channels.

distributors that they would get the same price for the Lakers Channel as a larger

distributor, such as DIRECTV (although it is common industry practice that larger

companies with more subscribers pay a lower price per subscriber than their

smaller competitors).

31.    During the negotiations over carriage of the Lakers Channel, Mr.

York heard a "rumor" about TWC's size-insensitive MFN offer.  Mr. York was

concerned that if the smaller distributors buckled under the pressure of the MFN

offer and agreed to carry the Lakers Channel before the larger distributors

negotiated a deal, it would "empower[] TWC to hold firm on their price."  Mr.

York was right.

32.    Charter signed a Lakers Channel carriage agreement on October 25,

2012, just before the NBA season started.  At that time, Mr. York told a colleague

that he believed Charter agreed to TWC's rates in order to get the MFN protection.

33.    Two days later, on October 27, 2012, AT&T signed a Lakers Channel

carriage deal.

34.    The Lakers season tipped off on October 30, 2012.

35.    The MVPDs that had already launched the Lakers Channel

aggressively marketed against their competitors that had not reached a deal with

TWC.  They sensed an opportunity to win subscribers who wanted to watch Lakers

games live on television but could not due to their video provider's lack of

1   carriage.  For example, Charter ran radio advertisements targeting AT&T before

2   AT&T's U-verse video service launched the Lakers Channel.  Similarly, after

3   launching the Lakers Channel, AT&T began using a marketing campaign in its

4   stores targeting Cox subscribers:  "See both Padres and Lakers on U-verse TV but

5   not Cox."

6   　　　36.   TWC succeeded in its strategy.  On November 7, 2012, less than one

7   week after the NBA season started, Cox agreed to carry the Lakers Channel.  Cox

8   had intended to hold out, but AT&T—which offers its U-verse video service inside

9   the Cox local market—was offering the Lakers Channel.  Cox agreed to pay

10  TWC's full asking price despite internal analyses estimating the Lakers Channel

11  was worth significantly less.  Indeed, Cox paid nearly 60% higher than its analyses

12  had initially suggested the Lakers Channel was worth.

13  　　　37.   DIRECTV faced a similar dilemma.  Most of its competing video

14  distributors in the LA area had launched the Lakers Channel, and it was losing

15  hundreds of customers per week to them.  Consequently, on November 14, 2012,

16  ten days after Cox agreed to carry the Lakers Channel, DIRECTV agreed to pay

17  TWC's initial asking price, even though DIRECTV's internal analyses estimated

18  that carriage of the Lakers Channel was worth significantly less.  DIRECTV

19  agreed to pay almost 50% more than its internal financial analysis suggested.

20

38.     Moreover, TWC was able to point to the size-insensitive MFNs in the smaller distributor carriage agreements as a reason not to offer DIRECTV a lower per subscriber fee for the Lakers Channel.

39.     Thus, DIRECTV rolled the dice during the Lakers Channel negotiations but lost because TWC was able to pursue a divide-and-conquer strategy by offering DIRECTV's smaller competitors financial incentives to sign a deal early in the negotiating process.  Having been burned by this experience, DIRECTV approached the Dodgers Channel negotiations determined not to allow TWC to successfully employ such a strategy again.

**C.     DIRECTV Was Intent on Ensuring That Its Competitors Stood With It Against TWC When Negotiating Carriage of the Dodgers Channel**

40.     A few months after successfully outmaneuvering DIRECTV during the Lakers Channel negotiations, TWC acquired, in January 2013, the local telecast rights for Dodgers baseball games beginning in the 2014 season.  As it had with the Lakers, TWC launched a new RSN—the Dodgers Channel—to serve as the exclusive home for Dodgers games.  Media reports at the time suggested that TWC would likely seek monthly distribution rates close to $5 a month per subscriber for the Dodgers Channel.

41.     In January 2014, TWC began discussing carriage of the Dodgers Channel with other LA area video distributors.  In doing so, TWC sought a higher

per subscriber rate from each distributor for carriage in the LA area ("Zone 1"), and lower per subscriber rates in other zones, located in regions further from LA.

42.     But, unlike TWC's experience with the Lakers Channel, none of TWC's competitors agreed to carry the Dodgers Channel that year.

43.     Hundreds of thousands of LA area residents—essentially, everyone living outside of TWC's service area—were unable to watch most televised Dodgers games during the 2014 baseball season.[4]

44.     To this day, TWC and its affiliates remain the only LA area video distributors that carry the Dodgers Channel, following a negotiation process corrupted by DIRECTV's orchestration of unlawful information sharing agreements with Cox, Charter, and AT&T.

---

[4] Bright House Networks, which is affiliated with TWC but does not operate in the LA area, carried the Dodgers Channel in its first season.  Charter reached an agreement to carry the Dodgers Channel in 2015, after signing a deal to acquire TWC. Champion Broadband reached a deal to carry the Dodgers Channel in 2014, but had only about 3,000 video subscribers in Arcadia and Monrovia, California, and has since gone out of business.

i. <u>DIRECTV, Cox, Charter, and AT&T Acknowledged That</u>
<u>Their Competitors' Carriage Decisions Would Significantly</u>
<u>Influence Whether They Decided to Launch the Dodgers</u>
<u>Channel</u>

45.     In assessing whether to carry the Dodgers Channel, DIRECTV conducted financial analyses indicating that DIRECTV's decision not to carry the Dodgers Channel would cause it to lose tens of millions of dollars in subscriber revenues in 2014 and each year thereafter.  These financial analyses also indicated that this anticipated loss would be reduced by approximately 40% if none of DIRECTV's competitors (other than TWC) carried the Dodgers Channel.  Thus, DIRECTV calculated exactly how much money it would save if other MVPDs in the LA area did not launch the Dodgers Channel.  Moreover, DIRECTV understood that, in order to reduce the likelihood that its subscribers would switch providers, it might have to pay more than its financial analyses suggested it should pay if any of its competitors decided to carry the Dodgers Channel, which is precisely what had happened with the Lakers Channel.

46.     Similarly, Cox, Charter, and AT&T each concluded that the decision of a competitor to carry the Dodgers Channel would be a significant development that could force each of them to reach a deal with TWC.  For example, on September 18, 2013, Charter's head of content acquisition suggested to Charter's

1  CEO that "we discuss sitting this one out until at least if and when Direct does a

2  deal."  Similarly, an undated Cox "Dodgers Discussion" document states that Cox

3  should "consider a rate MFN'd deal only in the event DirecTV, Dish or ATT do a

4  deal, accept any related rate penalty if we are forced to."  In addition, a February

5  26, 2014 Dodgers Channel presentation by AT&T's President of Content

6  recommended to his direct supervisor that a "key decision point[]/risk factor[]"

7  would be "carriage decisions by DirecTV."

8  **D.    DIRECTV Orchestrated and Implemented Dodgers Channel Carriage**

9        **Information Exchanges With Cox, Charter, and AT&T**

10        47.    Given that TWC's negotiating strategy had forced DIRECTV to pay

11  more for the Lakers Channel than it thought the channel was worth, DIRECTV and

12  its Chief Content Officer, Mr. York, were determined not to let that happen again.

13  To achieve this objective, Mr. York orchestrated a series of unlawful bilateral

14  information sharing agreements with three of DIRECTV's MVPD competitors:

15  Cox, Charter, and AT&T.

16        48.    In numerous phone calls and other private conversations, Mr. York

17  and his counterparts at DIRECTV's rivals Cox, Charter, and AT&T discussed non-

18  public information about the status of their negotiations with TWC and their future

19  plans about whether to carry the Dodgers Channel.  For instance:

20

- Cox's senior content executive, the Senior Vice President of Content Acquisition, testified under oath that he and Mr. York discussed their companies' Dodgers Channel carriage plans on multiple occasions. During one of these conversations, the Cox executive inquired about the status of DIRECTV's negotiations with TWC because TWC had indicated to him that it was close to reaching a deal with a video distributor. Mr. York responded that DIRECTV was not close to signing a deal and the two executives agreed to give one another a "heads-up" before launching the Dodgers Channel.

- Mr. York also offered to give this Cox executive an opportunity to sign a Dodgers Channel deal with TWC first before DIRECTV and thus protect any MFN terms.

- Charter's senior content executive, the Senior Vice President of Programming, testified under oath that he and Mr. York discussed that the price TWC offered their respective companies for the right to carry the Dodgers Channel was "outrageous."

- In a two-hour span the day after DIRECTV received TWC's initial Dodgers Channel offer, Mr. York spoke or attempted to speak with his counterparts at Cox, Charter, and AT&T. Mr. York later recommended against launching the channel because "other MVPDs appear in no rush to do a deal." At that

point in time, no distributor had made public statements about its Dodgers Channel carriage negotiations or plans.

- AT&T's senior content executive, the President of Content and Advertising Sales, called Mr. York on the day that he presented his recommendation against AT&T carrying the Dodgers Channel to his direct supervisor.  Over the course of the next few weeks, this AT&T senior executive attempted to speak with Mr. York on multiple occasions and did speak to him the day before he presented his recommendation to AT&T's CEO.

49.     Despite reservations about the carriage price TWC would request for the Dodgers Channel, DIRECTV's content team indicated in October 2013 that the company should "Plan to Launch" the Dodgers Channel and directed DIRECTV's technical staff to allocate sufficient satellite capacity to accommodate the network.

50.     On January 21, 2014, TWC presented its first formal Dodgers Channel carriage offer to a group of DIRECTV content executives, including Mr. York.

51.     The next day, Mr. York spoke with his Cox counterpart for twenty minutes and his Charter counterpart on a call or voicemail lasting about thirty seconds.  Later that day, Mr. York and his AT&T counterpart spoke for twelve minutes.  Mr. York spoke with his Charter counterpart for twenty minutes on January 29, 2014.

23

52.     Around this time period, a senior DIRECTV content executive emailed Mr. York to discuss the disagreement between DIRECTV's marketing and content groups about whether to carry the Dodgers Channel.  He asked for Mr. York's "thoughts about having a meeting" with the marketing team before the groups met with DIRECTV's CEO, Mr. White, on February 4, 2014 about carrying the Dodgers Channel, because the content team "think[s] don't do a deal," while the marketing team "want[s] to do a deal."  The DIRECTV marketing team had calculated that TWC's asking price was higher than financial analysis suggested it was worth—but nonetheless recognized that other factors not captured in that calculation made the Dodgers Channel worth carrying.

53.     In preparing for the meeting with DIRECTV's CEO, the marketing team put together a draft presentation deck that emphasized the Dodgers' iconic reputation and the fact that carrying the Dodgers Channel was important to DIRECTV's marketing strategy of being a leader in sports content.  For example, the deck listed as reasons for doing a deal that "LA is our largest subscriber market" and that "not offering a marquee franchise will significantly diminish our sports leadership claim."  Mr. York edited this deck before it was presented to DIRECTV's CEO.  Notably, on a slide listing strategic considerations for and against carrying the Dodgers Channel, Mr. York, having spoken with his counterparts at Cox, Charter, and AT&T added that one reason DIRECTV should

not carry the channel at TWC's asking price was that "[o]ther MVPDs appear in no rush to do a deal."

**Against Deal**

● Carriage of Dodgers and the ~~assoc~~iate *all other CPs* high rates will set a precedent and embolden ~~other rights holders~~, and lead to higher sports costs over time; Will require other trade offs ~?.

● Other MVPDs appear in no rush to do a deal, Dish very unlikely
● ~~Dish very~~ unlikely , others ?.    • worse than Houston, which we don't carry[22]

54.   At the time that Mr. York made this edit, no other distributor had made public statements about its Dodgers Channel carriage negotiations or plans.

55.   On February 4, 2014, Mr. York, along with members of his content team and DIRECTV's marketing team, met with Mr. White to discuss their strategy for responding to TWC's offer.  At this meeting, Mr. York and his colleagues recommended against carrying the Dodgers Channel at TWC's asking price.  To support this recommendation, Mr. York used the presentation deck mentioned above, which incorporated his edit indicating that "[n]o other MVPD appears to be in a rush to do the Dodgers deal" in the final text.

**Against Deal**

● Carriage of Dodgers and the associated above market rates will set a bad precedent and embolden all other rights holders (not just confined to sports) and will lead to higher content costs over time

● No other MVPD appears to be in a rush to do the Dodgers deal; Dish very unlikely to ever carry network

● Dodgers deal is a more expense, off-market deal than either the PAC-12 or CSN Houston which DTV chose not to carry

25

56.     Based on the information he was provided, Mr. White "planned to carry the channel" and "budgeted to carry the channel," but hoped to negotiate TWC down from its initial asking price.  Following the February 4, 2014 meeting with Mr. White, DIRECTV informed TWC that its initial asking price was too high.

57.     About one month later, Mr. White sent an email to Mr. York declaring that the MVPDs "may have more leverage if we all stick together" on the Dodgers Channel.  Mr. York "[a]greed" that "others holding firm is key."  This email exchange occurred right before the start of the 2014 baseball season and during the heart of TWC's Dodgers Channel negotiations.

58.     Two months later, Mr. White made a similar pronouncement during an industry conference, stating that MVPDs should "start to stand together, like most of us have been doing in Los Angeles for the first time ever, by the way, with the Dodgers on outrageous increases and excesses."  At the time that Mr. White made this public statement, Mr. York had already been having discussions with his counterparts at Cox, Charter, and AT&T and, unsurprisingly, none of them had reached a deal with TWC to carry the Dodgers Channel.

59.     During DIRECTV's negotiations with TWC, at least one person informed DIRECTV that Mr. York had exchanged strategic information with competitors in order to facilitate a Dodgers Channel blackout in the LA area.  In

1  April 2014, an anonymous complaint filed on the DIRECTV ethics portal claimed

2  that Mr. York had been "[s]peaking with other satellite, cable, and telco companies

3  about NOT carrying the Dodgers on DIRECTV."  Similar internal ethics

4  complaints about Mr. York's exchanges of information with competitors were filed

5  in May and September 2014.

6       60.    Publicly messaging its opposition to TWC's initial offer for Dodgers

7  Channel carriage also helped DIRECTV to further its information sharing scheme.

8  A DIRECTV executive told Mr. York and others that DIRECTV's competitors

9  were emboldened to "sit on the sidelines" because they had not "seen any 'not if,

10  but when' rhetoric from DTV" regarding carriage of the Dodgers Channel, and

11  encouraged DIRECTV employees to "message internally and externally alike that

12  we are NOT doing the Dodgers deal."  A DIRECTV executive testified that if

13  DIRECTV had "started messaging that we are going to do a deal, that probably

14  would have spurred on others to do the deal" and that such a scenario "wouldn't

15  benefit [DIRECTV] in any way."  This testimony further reflects the fact that

16  DIRECTV understood that its expected carriage plans would have a domino effect

17  on competitors in the Dodgers Channel negotiations with TWC.

18       61.    Accordingly, DIRECTV employees regularly touted their opposition

19  to carrying the Dodgers Channel in the press.  For instance, in March 2014, Mr.

20  York was quoted in the press stating that it was "highly unlikely that anybody of

27

1   any real merit will be carrying that network soon."  The same article also reported

2   that Mr. York "predict[ed]" that the Dodgers carriage "logjam will not break

3   before the first week of the new season is over and perhaps not for a long time after

4   that."  In April 2014, Mr. York was quoted as stating that DIRECTV had an

5   obligation to "not say[] yes to everything that's proposed" to it when he was asked

6   about carriage of the Dodgers Channel.

7        62.    At the beginning of the 2014 baseball season, on March 29, 2014,

8   TWC offered DIRECTV incentives and other terms of value that significantly

9   improved its offer.  DIRECTV did not accept the offer, but rather, on April 16,

10  2014, responded by counter-proposing a lower rate structure and several free

11  months.

12       63.    After no MVPD agreed to carry the Dodgers Channel, TWC offered

13  in August 2014 to allow immediate carriage of the Dodgers Channel by any video

14  distributor that agreed to binding arbitration.  Specifically, TWC proposed that

15  both it and any interested distributor submit their best-and-final offer to a mutually

16  agreed-upon arbitrator, who would then decide which proposal reflected the most

17  fair carriage terms.  This offer had no price floor, but no video distributor agreed to

18  arbitration, even though arbitration would have allowed each MVPD to present its

19  valuation analysis to a neutral party who could order TWC to accept that valuation

20  without regard to TWC's previous bargaining position.

64.     DIRECTV still does not carry the Dodgers Channel even though it has otherwise sought to distinguish itself from competitors by offering consumers the broadest range of sports content.

ii. <u>DIRECTV and Cox Shared Non-Public Competitively Sensitive Information about Their Future Dodgers Channel Carriage Plans</u>

65.     Mr. York and his counterpart at Cox, the Senior Vice President of Programming, agreed to share forward-looking strategic information about the Dodgers Channel, and did share that information.  Their exchanges of information demonstrate their agreement and reflect concerted action between horizontal competitors.

66.     On October 2, 2013, Cox's then-incoming Senior Vice President of Programming and his colleagues met to discuss their carriage plans for the Dodgers Channel.  They concluded that Cox should decline carrying the network unless one of the video distributors that overlapped with Cox's service area, such as DIRECTV or AT&T, reached a deal with TWC, at which point Cox would need to reassess its position.

67.     Eight days later, on October 10, 2013, Cox's incoming Senior Vice President of Programming met Mr. York for breakfast in New York City.  That

1   executive has admitted that he and Mr. York discussed the "rising sports costs"

2   their competing companies faced, including the Dodgers Channel.

3       68.    On January 21, 2014, TWC presented its initial formal Dodgers

4   Channel carriage offer to DIRECTV.  The next day, Mr. York called his Cox

5   counterpart and they spoke for twenty minutes.  That same day, Mr. York also

6   spoke or attempted to speak with his counterparts at Charter and AT&T.

7       69.    On January 27, 2014, TWC presented its formal Dodgers Channel

8   carriage offer to Cox. TWC asked for the same rate structure as it had sought from

9   DIRECTV and other video distributors.

10      70.    On February 4, 2014, Cox decided that it was interested in pursuing

11  an *a la carte* carriage deal under which Cox would only pay a rate based on

12  subscribers that watched the Dodgers Channel instead of a rate based on all its

13  subscribers.  That same day, Mr. York gave DIRECTV's CEO a presentation

14  reflecting Mr. York's knowledge that DIRECTV's competitors "appear[ed] in no

15  rush to do a deal."

16      71.    During the first quarter of 2014, Cox increased its monthly fees for all

17  subscribers in the LA area.  Cox increased its prices in part to recoup the

18  anticipated cost of carrying the Dodgers Channel, which it never launched.

19      72.    Mr. York spoke with his Cox counterpart, the Senior Vice President

20  of Programming, on at least ten separate occasions between March and July 2014

30

1 as the baseball season began and the companies' Dodgers Channel carriage

2 negotiations continued.  At least seven of their phone conversations were more

3 than ten minutes long.

4   73. Cox's Senior Vice President of Programming has admitted under oath

5 that he and Mr. York shared strategic information about their companies' non-

6 public, future Dodgers Channel carriage plans on at least two calls.

7   74. During one call, which took place between March and June of 2014,

8 Cox's Senior Vice President of Programming reached out to Mr. York after TWC

9 told him that "an agreement between another distributor and SportsNet LA was

10 imminent."  The Cox executive called Mr. York to ask "if DIRECTV was the other

11 distributor."  Mr. York told the Cox executive that DIRECTV was not close to

12 launching.  During this conversation, they expressly agreed to "give each other a

13 heads-up if their respective MVPDs were going to launch" the Dodgers Channel

14 "before it was public knowledge."

15   75. In another call during the same time period, Mr. York called his Cox

16 counterpart and said that "before DIRECTV were to sign a deal [to carry the

17 Dodgers Channel], Mr. York would let [him] know, in case [he] wanted to sign a

18 deal and protect any MFN terms, so [Cox] could choose to sign first."  Mr. York's

19 offer to forgo a first-mover advantage was contrary to DIRECTV's own economic

20

1  interest as his plan could risk the terms DIRECTV would have negotiated with

2  TWC and could also reduce the costs of one of DIRECTV's competitors.

3      76.    Cox did not carry the Dodgers Channel in 2014 and has still not

4  reached an agreement to carry the channel.  Consumers located in the Cox service

5  territory in the LA area did not have regular access to most televised Dodgers

6  games during the 2014, 2015, and 2016 baseball seasons.

7              iii.   <u>DIRECTV and Charter Shared Non-Public Competitively</u>

8                     <u>Sensitive Information about Their Future Dodgers Channel</u>

9                     <u>Carriage Plans</u>

10     77.    Mr. York and his counterpart at Charter, the Senior Vice President of

11  Programming (the most senior content executive at Charter), agreed to share

12  forward-looking strategic information about the Dodgers Channel, and did share

13  that information.  Their exchanges of information demonstrate their agreement and

14  reflect concerted action between horizontal competitors.

15     78.    Charter conducted no formal analysis to assess the value of offering

16  the Dodgers Channel.  Instead, Charter's Senior Vice President of Programming

17  recommended a strategy—that Charter hold out until DIRECTV carried the

18  Dodgers Channel and then reevaluate.  Charter's senior content executive testified

19  that his recommendation on this important carriage decision was based on a "gut

20  feeling early on in the process" that Charter should not be the first MVPD to

1  launch the Dodgers Channel, which "sort of solidified, came together by the end of

2  summer, fall of 2013."  Mr. York and his counterpart at Charter spoke on the

3  phone at least twice during that time period.

4       79.    Mr. York and his Charter counterpart had a history of sharing

5  information with one another about strategic negotiations and plans while

6  negotiations were ongoing.  In January 2014 (as discussions about the Dodgers

7  Channel began to heat up), DIRECTV's carriage negotiations with The Weather

8  Channel failed and the channel went into a blackout on DIRECTV.  During the

9  blackout, The Weather Channel sought to run advertisements attacking DIRECTV

10  over Charter's service.  Charter's Senior Vice President of Programming left a

11  voicemail for Mr. York.  In the voicemail, this Charter senior executive assured

12  Mr. York that he would stop The Weather Channel from running such an ad over

13  Charter's service, calling the favor "my little bit for the planet earth."

14       80.    Similarly, in September 2014, Charter's Senior Vice President of

15  Programming left Mr. York several voicemails concerning Charter's negotiations

16  with the co-owner of Hulu about Hulu's online subscription video service, letting

17  him know that Charter was not inclined to allow its video subscribers to access

18  Hulu's service using their Charter accounts, and asking if DIRECTV planned to

19  reach a deal concerning Hulu.  Charter's Senior Vice President of Programming

20  left Mr. York at least one voicemail speaking in coded language about Charter's

33

ongoing negotiations with Hulu's co-owner: "I was going to get doing it if I had to, but then I remembered a little birdie saying that you were busy with my heavyweight friend perhaps."

81.     On September 17, 2013, Mr. York and his counterpart at Charter spoke to one another on the phone. The day after this conversation, Mr. York's Charter counterpart proposed for the first time to Charter's CEO that Charter adopt a strategy of waiting for DIRECTV to carry the Dodgers Channel. Specifically, this senior executive "[s]uggest[ed] we discuss sitting this one out until at least if and when Direct does a deal."

82.     On October 24, 2013, Charter's Senior Vice President of Programming met with his CEO to set Charter's content budget for 2014, including estimated costs for carrying the Dodgers Channel. This senior executive proposed that Charter "hold tight, see where we are in July . . . if Direct goes in May/June we can still get that deal. But let it play out." Later that day, this senior executive texted Mr. York: "Can I call you now? Funny had something for u. Where can I call."

83.     On November 5, 2013, a subordinate of Charter's Senior Vice President of Programming suggested that Charter take a "first in strategy" with the Dodgers Channel that would "guarantee[] carriage and put[] pressure on others" while affording Charter "solid MFN" protection, such as the MFN protection

1   Charter received from TWC during the Lakers Channel negotiations.  Charter's

2   Senior Vice President of Programming declined to pursue the same strategy that

3   Charter had used for the Lakers Channel, explaining that "I think Direct will not be

4   there at launch.  Maybe AT&T will but if no [satellite] carriage at launch there is

5   nowhere to get the games in our markets."  At the time, DIRECTV had not made

6   any public statements about its Dodgers Channel carriage plans.

7        84.    On January 21, 2014, TWC made its initial offer to DIRECTV.  Mr.

8   York called his counterpart at Charter the following afternoon (and spoke with

9   both his Cox counterpart and AT&T counterpart).  On January 23, 2014, TWC sent

10   Charter its Dodgers Channel offer.  After playing phone tag for several days, Mr.

11   York and his Charter counterpart had a twenty-minute call on January 29, 2014.

12        85.    Charter's Senior Vice President of Programming consistently told

13   TWC that Charter would not consider carrying the Dodgers Channel unless

14   DIRECTV launched first.

15        86.    Charter's Senior Vice President of Programming admitted that, on

16   April 30, 2014, about one month after the baseball season began but while

17   negotiations were still continuing, he and Mr. York discussed "the high cost of

18   sports programming, including the high price that TWC paid for the rights to

19   SportsNet LA and was demanding for carriage."  He also testified that he and Mr.

20

York discussed that the price TWC offered their respective companies for carriage was "outrageous."

87.    Charter did not carry the Dodgers Channel during the 2014 baseball season.  Subscribers located in the Charter service territory in the LA area did not have regular access to most televised Dodgers games during the 2014 baseball season or at the start of the 2015 season.

88.    Charter announced that it would acquire TWC in May 2015.  Soon thereafter, Charter agreed to carry the Dodgers Channel.

iv.   DIRECTV and AT&T Shared Non-Public Competitively Sensitive Information about Their Future Dodgers Channel Carriage Plans

89.    Mr. York and his counterpart at AT&T, the most senior content executive there, agreed to share forward-looking strategic information about the Dodgers Channel, and did share that information.  Their exchanges of information demonstrate their agreement and reflect concerted action between horizontal competitors.

90.    Mr. York's AT&T counterpart became President of Content and Advertising Sales ("President of Content") in June 2013 and Mr. York, who previously had worked at AT&T, cultivated a close relationship with this person.  Mr. York offered to "show [him] around [LA] and help meet the players in this

36

1   crazy content world."  Thus, as AT&T's President of Content testified, Mr. York

2   "helped [him] get a lay of the land in the industry" and introduced him to "various

3   players in the industry."

4        91.    AT&T's President of Content understood the importance of

5   developing relationships with AT&T's direct competitors.  In a handwritten note

6   taken a few weeks after assuming his new position, he wrote that he "need[ed] to

7   go meet industry peers," including DIRECTV.  Mr. York organized a one-on-one

8   breakfast with his AT&T counterpart several weeks later at a hotel near AT&T's

9   offices.

10       92.    On January 16, 2014, TWC presented its formal Dodgers Channel

11  carriage offer to AT&T.  TWC asked for the same rate structure as it later sought

12  from DIRECTV and other video distributors.

13       93.    On January 21, 2014, AT&T's President of Content met with other

14  members of his content team to discuss TWC's offer.  Like Charter's Senior Vice

15  President of Programming, AT&T's President of Content indicated that his "gut"

16  instinct was to "sit on sidelines," but noted that the possibility that "DIRECTV

17  may move" was a factor that could cause AT&T to revisit its position.

18       94.    On January 22, 2014, Mr. York and his AT&T counterpart spoke for

19  twelve minutes.  At the time of this call, DIRECTV and AT&T had both recently

20  received Dodgers Channel offers from TWC.

95.     On February 25, 2014, an AT&T Vice President expressed concern that his earlier public comments to Bloomberg News about the Dodgers Channel were "too vanilla" and stated that AT&T might "need to take more of a stand." Ten days later, the executive suggested that AT&T publicly communicate its Dodgers Channel carriage "position more aggressively to influence other MVPD's strategy."

96.     On February 26, 2014, AT&T's President of Content and his content team recommended to his direct supervisor that AT&T decline to launch the Dodgers Channel at TWC's asking price.  They described AT&T's "initial implementation strategy" as "[h]old-out as long as DirecTV does not carry."  The day of this presentation, AT&T's President of Content left a voicemail for Mr. York.  He then tried to reach Mr. York on February 28, 2014, texting "Just tried you.  I am around if you free up.  I will try u tomorrow if not."  Then, the next day, AT&T's President of Content left another voicemail for Mr. York, this time stating "I had three things to catch up with you on, ah, two sports and one news."

97.     After leaving this message, AT&T's President of Content went to AT&T's Dallas headquarters for a series of strategy meetings and kept trying to reach Mr. York.  This AT&T senior executive and Mr. York finally spoke for twenty minutes on March 4, 2014.  The next day, this same AT&T executive met with AT&T's CEO to discuss TWC's Dodgers Channel offer.  AT&T's President

of Content "recommend[ed] not launching [the Dodgers Channel] unless TWC reduces the rate materially," but noted that DIRECTV launching was an "outstanding risk factor."  This AT&T executive's handwritten notes explained that AT&T's "intent [was] to message but hold, pivot if we have to—DTV!"

98.   On March 11, 2014, TWC told an AT&T negotiator that it "was unlikely to move off [its] initial asking price of $[#.##] now because [TWC] wouldn't be able to offer [AT&T] a lower rate and not offer it to a larger distributor."

99.   The next day, Mr. York texted AT&T's President of Content "Got a sec to talk?" and Mr. York's AT&T counterpart responded "Yep.  You on cell or work?"  Mr. York responded "Work."  The following day, AT&T's President of Content—who has referred to carriage offers as "pitches"—again texted Mr. York "Forgot to tell you but we got a [##] mph pitch yesterday."[5]  A few hours later, AT&T's President of Content continued "Consistent with what you got?" and Mr. York responded "Hope u hit it out!"  This exchange occurred only two days after TWC had informed AT&T that it was unlikely to change its initial asking price.

100.   AT&T acquired DIRECTV in July 2015.  AT&T still does not carry the Dodgers Channel.  AT&T subscribers outside of TWC's service territory in the

---

[5] As explained above, although the actual price figures have been omitted to protect competitively sensitive information, the speed of the quoted pitch in this text matched the cents in TWC's offer to AT&T.

1  LA area did not have regular access to most televised Dodgers games during the

2  2014, 2015, or 2016 baseball seasons.

3  **V.      DIRECTV'S INFORMATION EXCHANGES HAD THE LIKELY**

4  **EFFECT OF HARMING COMPETITION**

5  **A.     Defendants Have Market Power—the Ability to Harm Competition—in**

6  **the Market for Video Distribution Services**

7          101.   One tool that courts use to assess the competitive effects of concerted

8  action is defining a relevant market—the zone of competition among the agreeing

9  rivals in which the agreement may affect competition.  A relevant market contains

10 both a product dimension (the "product market") and a geographic dimension (the

11 "geographic market").  This case concerns the distribution of professional video

12 content (especially sports content) by MVPDs in multiple geographic markets.

13                 i.   Video Distribution Service Is a Relevant Product Market

14         102.   Video distributors acquire the rights to transmit video content from

15 programmers, then aggregate that content and distribute it to subscribers who pay

16 for the service.  For example, subscribers to an MVPD's pay television service

17 typically purchase access to a sizeable array of channels, including for example

18 news, dramas, and reality television programs, as well as the type of sports content

19 at issue in this case.  Subscribers, as well as industry participants, view these

20 services as reasonably interchangeable with each other.  Moreover, subscribers and

40

1    industry participants view video distribution services as distinct from—and not

2    reasonably interchangeable with—other forms of entertainment, such as attending

3    live sports games or a music concert.  The distribution of professional video

4    programming services to residential or business customers ("video distribution

5    services") is a relevant product market.

6          103.   Video distributors compete with each other on price and programming

7    content to attract and retain paid video customers.  MVPDs, especially DIRECTV,

8    often attempt to distinguish themselves from their competitors on the basis of

9    sports content.  DIRECTV bills itself as the "undisputed leader" for sports content

10   among video distributors and, to support that claim, spends over $1 billion each

11   year to obtain the exclusive rights to provide NFL Sunday Ticket and features it

12   prominently in its marketing materials.

13         104.   Local sports content is a crucial component of competition between

14   video distributors.  Sports are often telecast locally on RSNs, and DIRECTV has

15   publicly identified the availability of RSNs as vital to its ability to compete.  In

16   filings submitted to the Federal Communications Commission ("FCC") regarding

17   its program access regulations, which had previously reduced DIRECTV access to

18   local RSNs, DIRECTV described local sports content on RSNs as "some of the

19   most popular and expensive in the market" and questioned whether a video

20   distributor could compete at all without access to this programming.  DIRECTV

1   even complained that a cable company's decision to deny DIRECTV access to an

2   RSN "caused a 33 percent reduction in the households subscribing to [satellite TV]

3   service."

4       ii.   The Cox and Charter LA Service Areas Are Relevant

5          Geographic Markets

6      105.   Consumers seeking to purchase video distribution services must

7   choose from among those providers that can offer such services directly to their

8   home or business.  Direct broadcast satellite providers, such as DIRECTV, can

9   serve customers almost anywhere in the United States.  In addition, online video

10   distributors are available to any consumer with internet service sufficient to deliver

11   video of an acceptable quality.  In contrast, wireline video distributors such as

12   cable and telephone companies, which include Cox, Charter, and AT&T, serve

13   only distinct geographic areas where they have deployed network facilities.  A

14   customer cannot purchase video distribution services from a wireline distributor

15   that does not operate network facilities that connect to the customer's home or

16   business.

17      106.   Thus, from a customer's perspective, the relevant geographic market

18   for video distribution services is whatever services are available on an individual

19   location-by-location basis.  For ease of analysis, however, these markets can be

20   aggregated to portions of the local franchise areas, or footprints, of the various

1 video distribution service providers where consumers face similar service-provider

2 choices.

3     107.   In the Dodgers Channel carriage area in 2014, three cable companies

4 offered video distribution services to a significant area:  TWC, Cox, and Charter.[6]

5 The service areas of these three cable providers did not overlap.

6     108.   Cox's service area within the LA area is a relevant geographic market.

7 As discussed further below, consumers within this area generally faced the same

8 service-provider choices.  Customers within the Cox service area could choose

9 from Cox, DIRECTV, DISH, and nationwide online providers.  Some customers

10 within the Cox service area might have AT&T or Verizon as an additional

11 competitive option, but not both.  Nevertheless, because a small but significant

12 price increase by a hypothetical monopolist of video distribution services in this

13 area would not be made unprofitable by consumers switching to other services

14 offered outside of the area, the Cox LA service area is a relevant geographic

15 market.

16     109.   Charter's service area within the LA area is also a relevant geographic

17 market.  As discussed further below, consumers within this area generally faced

18 _____

19 [6] Mediacom and Suddenlink also operated in the LA area in 2014, but each had
fewer than 5,000 video subscribers.  With less than 0.5% of LA area total
20 subscribers, neither was competitively significant for purposes of this case.  For
comparison, TWC (30%), Charter (6.3%), and Cox (5.3%) each had at least
200,000 video subscribers in the LA area.

1   the same service-provider choices.  Customers within the Charter service area

2   could choose from Charter, DIRECTV, DISH, and nationwide online providers.

3   Some customers within the Charter service area might have AT&T or Verizon as

4   an additional competitive option, but not both.  Nevertheless, because a small but

5   significant price increase by a hypothetical monopolist of video distribution

6   services in this area would not be made unprofitable by consumers switching to

7   other services offered outside of the area, the Charter LA service area is a relevant

8   geographic market.

9                    iii.   There Are High Barriers to Entry, Expansion and Repositioning

10                          in Local Video Distribution Services Markets

11       110.   Local video distribution service markets are characterized by high

12   barriers to entry.  Providers seeking to expand their geographic reach or reposition

13   themselves to offer such services in a particular area face high entry barriers as

14   well.

15       111.   In order to offer video distribution services, wireline and direct

16   broadcast satellite providers must incur enormous upfront investment to construct a

17   distribution infrastructure.  Wireline distributors must construct network facilities

18   that reach every home or business that they wish to serve.  Likewise, satellite

19   companies such as DIRECTV must launch satellites and deploy earth stations to

20   receive signals from those satellites.

112.   Providers may also need to obtain the proper regulatory authority prior to offering video distribution services.  Wireline providers generally must obtain a franchise from local, municipal, or state authorities.  Direct broadcast satellite providers must obtain approval from the FCC prior to operating the satellites and earth stations that comprise their networks.

113.   Online video distributors represent the most likely prospect for successful and significant competitive entry, but they face significant barriers that limit their ability to compete with MVPDs in the short-to-medium term.  One such barrier is the need to obtain access to a sufficient amount of content to become viable substitutes.  Online video distributors generally offer less content than MVPDs and fewer live sports telecasts of local games.  Due in part to these limitations, online video distributors account for only 5% of total video distribution service revenues.

iv.   DIRECTV, Cox, and AT&T Have Market Power in the Highly Concentrated Cox LA Service Area

114.   Consumers in the Cox service area faced limited choices for video distribution services in 2014.  In many parts of this area, customers could access video distribution services from only three providers:  Cox, DISH, or DIRECTV. In some areas within the Cox footprint, customers could also access video services from either AT&T or Verizon (but not both) where those companies had upgraded

45

1  their telephone networks to offer video service as a fourth alternative for

2  consumers.

3       115.   DIRECTV acted in concert with Cox and, therefore, it is appropriate

4  to consider the combined market power of the two firms in the relevant geographic

5  market.  DIRECTV and Cox combined account for a greater than 70% share of the

6  Cox local market.  By acting in concert under these circumstances, DIRECTV and

7  Cox had the ability to reduce output and product quality to subcompetitive levels.

8       116.   DIRECTV also acted in concert with AT&T in Cox's service area.

9  DIRECTV, Cox, and AT&T combined account for a greater than 75% share of the

10  Cox local market.  By acting in concert under these circumstances, the three

11  companies had the ability to reduce output and product quality to subcompetitive

12  levels.

13       v.   <u>DIRECTV, Charter, and AT&T Have Market Power in the</u>

14       <u>Highly Concentrated Charter LA Service Area</u>

15       117.   Consumers in the Charter service area also faced limited choices for

16  video distribution services in 2014.  In many parts of the Charter service area,

17  customers could access video services from only three providers:  Charter, DISH,

18  or DIRECTV.  In some areas within the Charter footprint, customers could also

19  access video services from either AT&T or Verizon (but not both) where those

20

1   companies had upgraded their telephone networks to offer video service as a fourth

2   alternative for consumers.

3       118.   DIRECTV acted in concert with Charter and, therefore, it is

4   appropriate to consider the combined market power of the two firms in the relevant

5   geographic market.  DIRECTV and Charter combined account for a greater than

6   50% share of the Charter local market.  By acting in concert under these

7   circumstances, DIRECTV and Charter had the ability to reduce output and product

8   quality to subcompetitive levels.

9       119.   DIRECTV also acted in concert with AT&T in Charter's service area.

10   DIRECTV, Charter, and AT&T combined account for a greater than 55% share of

11   the Charter local market.  By acting in concert under these circumstances,

12   DIRECTV, Charter, and AT&T had the ability to reduce output and product

13   quality to subcompetitive levels.

14   **B.**    **The Information Exchanges Orchestrated by DIRECTV Are of the**

15         **Type That Is Likely to Harm Competition When Carried Out by**

16         **Parties With Market Power**

17       120.   The market for video distribution services in the LA area is highly

18   concentrated.  The local markets for video distribution services are characterized

19   by high barriers to entry, just three to four entrenched competitors, and a history of

20   interdependent price and output.

47

1    121.   Competition is likely to be harmed when competitors with market

2  power in concentrated markets, such as the markets at issue, directly exchange

3  strategic information about current and forward-looking plans for product features

4  on which they compete.  Here, the information exchanged directly concerned the

5  negotiating positions that were being taken by competitors leading up to and

6  during their negotiations with a common programming supplier.  That supplier had

7  every legitimate reason to believe that the companies were viewing each other

8  warily and calculating the risk that the other might move first.

9    122.   The strategic information that DIRECTV exchanged with Cox,

10  Charter, and AT&T was competitively sensitive and a material factor to their

11  decisions not to carry the Dodgers Channel.  Like price, content carriage—and

12  particularly local sports content carriage—is a crucial aspect of competition

13  between video programming distributors to attract and retain subscribers.  Just as a

14  subscriber might switch away from a distributor in order to obtain a lower price, a

15  subscriber might switch away from a distributor in order to watch programming

16  that the subscriber's current distributor does not offer.  But if the subscriber has no

17  alternative video programming distributor from which to obtain the desired

18  content, the possibility that this subscriber might switch to a competitor is

19  eliminated.  When video distributors that are competing for the same subscribers

20  exchange their strategic carriage plans, comfort replaces uncertainty and reduces

48

1   their incentives to launch that content.  After all, if no competitor offers particular

2   content, there is no risk current subscribers would switch to a competitor in order

3   to watch that content on another distributor's video service.

4        123.   Information regarding sports content is particularly significant, as

5   sports are an important aspect of the video distribution that customers in the LA

6   region purchase.  As noted above, DIRECTV has recognized that RSN content is

7   "some of the most popular and expensive in the market" and it has attempted to

8   differentiate itself as "the undisputed leader in sports."

9        124.   The direct competitor communications at issue here took place

10   between DIRECTV's Chief Content Officer and his counterparts at Cox, Charter,

11   and AT&T.  These high-level executives had direct authority over their respective

12   companies' content carriage negotiations and significant influence over their

13   companies' content carriage decisions, thereby allowing them to act on the

14   information that they learned and steer their companies' decisions and negotiation

15   strategies for the Dodgers Channel.

16        125.   These direct communications took place in private settings and

17   involved the exchange of confidential, non-public information.  The information

18   was at times exchanged in coded language intended to mask the content of the

19   communications.  In addition to the direct communications, DIRECTV executives

20

1   consistently messaged DIRECTV's opposition to carriage of the Dodgers Channel

2   through the press.

3   **C.**     **DIRECTV'S Information Exchanges Corrupted the Competitive**

4          **Process and Contributed to the Blackout of Dodgers Games**

5       126.   The information sharing agreements that DIRECTV orchestrated with

6   its direct competitors at Cox, Charter, and AT&T tainted the competitive process

7   for carriage of the Dodgers Channel. They dampened the incentives of the

8   companies to negotiate for and carry the Dodgers Channel, reduced their

9   responsiveness to customer demand, and deprived LA area Dodgers fans of a

10   competitive process that took into full account market demand for watching

11   Dodgers games on television.

12       127.   The information shared between DIRECTV and its competitors was a

13   material factor in their decisions about whether and when to offer the Dodgers

14   Channel in competition with one another.

15       128.   During the Dodgers Channel carriage negotiations, DIRECTV learned

16   valuable strategic information from Cox, Charter, and AT&T that reduced the

17   uncertainty that DIRECTV should have faced from not knowing whether its

18   subscribers would have the option of switching to these competitors in order to

19   watch Dodgers games on television. This knowledge was a material factor in

20   DIRECTV's decision not to launch the Dodgers Channel. Mr. York testified that

1   other MVPDs not appearing to be in any rush to do the Dodgers Channel deal was

2   a strategic consideration against DIRECTV doing the deal.  Indeed, he edited a

3   presentation given to DIRECTV's CEO to make sure the presentation included that

4   important factor.  One of Mr. York's subordinates testified that information about

5   competitors' plans could lead DIRECTV to be less aggressive in its proposals

6   because the company would be "less inclined to engage more meaningfully if

7   everybody was going to collectively sit on the sidelines."

8        129.   Cox, Charter, and AT&T each used strategic information obtained

9   from DIRECTV to reduce the uncertainty that they each should have faced from

10  not knowing whether their respective subscribers would be able to switch to

11  DIRECTV in order to watch Dodgers games on television.  This strategic

12  information was a material factor in their decisions not to launch the Dodgers

13  Channel.  Thus, this knowledge tainted what should have been their independent

14  decisions about whether to launch the Dodgers Channel.

15       130.   Because the information sharing agreements made it less likely that

16  DIRECTV and its major MVPD competitors would carry the Dodgers Channel,

17  those agreements had the tendency to reduce the quality of the video distribution

18  services DIRECTV, Cox, Charter, and AT&T provided in the LA area.  They

19  likewise had the tendency to reduce output by delaying the day when, if ever, the

20  Dodgers Channel will be widely carried.  These effects were ultimately felt

throughout the Dodgers Channel broadcast territories where these companies offer service.  The reduction in quality and output was felt acutely in the spring of 2014, when the actions of these MVPDs contributed to the Dodgers Channel not being carried during the first weeks of the new season, a time when DIRECTV believed ratings would peak.  It continues to be felt by consumers today.

## VI.   DIRECTV'S UNLAWFUL INFORMATION EXCHANGES HAVE NO PROCOMPETITIVE JUSTIFICATION

131.   DIRECTV's unlawful information exchanges with Cox, Charter, and AT&T were not reasonably necessary to further any procompetitive purpose.  The information directly and privately shared between high-level executives was disaggregated, company specific, forward-looking, confidential, and related to a core characteristic of competition between them.

## VII.   VIOLATIONS ALLEGED

**Count 1:     DIRECTV Violated Section 1 of the Sherman Act by Entering Into an Unlawful Information Sharing Agreement with Cox**

132.   DIRECTV and Cox have engaged in an information sharing agreement in unreasonable restraint of interstate trade and commerce, constituting a violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.  This offense is likely to continue and recur unless the requested relief is granted.

1    133.   This information exchange scheme consisted of an agreement between

2    DIRECTV and Cox to share strategic information about their companies' Dodgers

3    Channel carriage negotiations and plans in order to limit the competitive pressure

4    on either of them to carry the Dodgers Channel.

5    134.   The information sharing agreement between DIRECTV and Cox has

6    harmed competition.  Their exchange of strategic information blunted the

7    companies' competitive incentives and corrupted the competitive process, which

8    had the likely and foreseeable result of decreasing quality and reducing output by

9    contributing to a blackout of the Dodgers Channel in part of the LA area.

10   **Count 2:      DIRECTV Violated Section 1 of the Sherman Act by Entering**

11   **Into an Unlawful Information Sharing Agreement with Charter**

12   135.   DIRECTV and Charter have engaged in an information sharing

13   agreement in unreasonable restraint of interstate trade and commerce, constituting

14   a violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.  This offense is likely

15   to continue and recur unless the requested relief is granted.

16   136.   The information exchange scheme consisted of an agreement between

17   DIRECTV and Charter to share strategic information about their companies'

18   Dodgers Channel carriage negotiations and plans in order to limit the competitive

19   pressure on either of them to carry the Dodgers Channel.

20

1    137.   The information sharing agreement between DIRECTV and Charter

2    has harmed competition.  Their exchange of strategic information blunted the

3    companies' competitive incentives and corrupted the competitive process, which

4    had the likely and foreseeable result of decreasing quality and reducing output by

5    contributing to a blackout of the Dodgers Channel in part of the LA area.

6    **Count 3:      DIRECTV Violated Section 1 of the Sherman Act by Entering**

7    **                  Into an Unlawful Information Sharing Agreement with AT&T**

8    138.   DIRECTV and AT&T have engaged in an information sharing

9    agreement in unreasonable restraint of interstate trade and commerce, constituting

10   a violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

11   139.   The information exchange scheme consisted of an agreement between

12   DIRECTV and AT&T to share strategic information about their companies'

13   Dodgers Channel carriage negotiations and plans in order to limit the competitive

14   pressure on either of them to carry the Dodgers Channel.

15   140.   The information sharing agreement between DIRECTV and AT&T

16   has harmed competition.  Their exchange of strategic information blunted the

17   companies' competitive incentives and corrupted the competitive process, which

18   had the likely and foreseeable result of decreasing quality and reducing output by

19   contributing to a blackout of the Dodgers Channel in part of the LA area.

20

# VIII.  REQUEST FOR RELIEF

141.    WHEREFORE, the United States requests that final judgment be entered against DIRECTV and AT&T declaring, ordering, and adjudging that:

a.      The aforesaid bilateral information sharing agreements unreasonably restrain trade and are unlawful under Section 1 of the Sherman Act, 15 U.S.C. § 1;

b.      DIRECTV and AT&T be permanently enjoined from transmitting non-public information concerning DIRECTV's and/or AT&T's negotiating position, strategy, or tactics concerning potential agreements for video programming distribution with any other MVPD when DIRECTV and/or AT&T and another MVPD anticipate negotiating, or are negotiating, with a common programming provider, in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1;

c.      DIRECTV and AT&T be required to monitor communications or other contacts between, on the one hand, the executives involved in these unlawful information sharing agreements and others who may take their place in the future, and on the other hand, their horizontal competitors, and to periodically report the time, place, participants, and substance of any such communications to the Department of Justice;

d.      DIRECTV and AT&T be required to implement training and

compliance programs to instruct their executives that exchanging non-public

strategic information about competitive offerings with competitors when not

necessary to further a procompetitive purpose is a violation of the antitrust

laws and report on these programs to the Department of Justice; and

e.      The United States be awarded its costs of this action and such other

relief as may be appropriate and as the Court may deem just and proper, and

such other relief as may be appropriate and as the Court may deem proper.

Dated: November 2, 2016

FOR PLAINTIFF UNITED STATES OF AMERICA:


*/s/ Jonathan Sallet*                          */s/ Scott Scheele*

JONATHAN SALLET                    SCOTT SCHEELE
Deputy Assistant Attorney General    Chief, Telecommunications &
for Litigation                                    Media Enforcement Section
                                                       LAWRENCE FRANKEL
                                                       Assistant Chief
                                                       JARED HUGHES
*/s/ Juan A. Arteaga*                        Assistant Chief

JUAN A. ARTEAGA
Deputy Assistant Attorney General
for Civil Enforcement
                                                       */s/ Patricia C. Corcoran*

                                                       PATRICIA CORCORAN
                                                       CORY BRADER
*/s/ Patricia Brink*                             DYLAN CARSON

PATRICIA BRINK                        PETER GRAY
Director of Civil Enforcement          DANIEL HAAR
                                                       MATTHEW JONES
                                                       JONATHAN JUSTL
                                                       DAVID LAWRENCE
                                                       ANNA SALLSTROM
                                                       KRISTINA SRICA

                                                       Attorneys for the United States
                                                       U.S. Department of Justice
                                                       Antitrust Division
                                                       450 5th Street N.W.
                                                       Washington, D.C. 20001
                                                       Telephone: 202-598-2529
                                                       Facsimile: 202-514-6381
                                                       E-mail: patricia.corcoran@usdoj.gov