ROBERT C. WALTERS, *pro hac vice*
  rwalters@gibsondunn.com
M. SEAN ROYALL, *pro hac vice*
  sroyall@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
2100 McKinney Avenue
Suite 1100
Dallas, TX 75201-6912
Telephone:  214.698.3100
Facsimile:    214.571.2900

MARCELLUS MCRAE, SBN 140308
  mmcrae@gibsondunn.com
KATHERINE V.A. SMITH, SBN 247866
  ksmith@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
333 South Grand Avenue
Los Angeles, CA  90071-3197
Telephone:  213.229.7000
Facsimile:   213.229.7520

Attorneys for Defendants

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

## WESTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | CASE NO. 2:16-cv-08150-MWF-E |
| Plaintiff, | **DEFENDANTS' NOTICE OF MOTION AND MEMORANDUM IN SUPPORT OF MOTION TO DISMISS PLAINTIFF'S COMPLAINT FOR FAILURE TO STATE A CLAIM** [F.R.C.P. 12(b)(6)] |
| v. | |
| DIRECTV GROUP HOLDINGS, LLC, et al. | |
| Defendants. | Hearing Date: March 10, 2017<br>Time:          9:30 AM<br>Place:         Courtroom 5A<br>Judge:        Hon. Michael W. Fitzgerald |

Gibson, Dunn &
Crutcher LLP

---

**DEFENDANTS' NOTICE OF MOTION AND MOTION TO DISMISS**, CASE NO. 2:16-cv-8150-MWF-E

# NOTICE OF MOTION

TO THE HONORABLE COURT, ALL PARTIES, AND THEIR COUNSEL OF RECORD:

PLEASE TAKE NOTICE that on March 10, 2017, at 9:30 a.m., in Courtroom 5A of the above-captioned Court, located at 350 W. 1st Street, Los Angeles, California 90012, pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, Defendants DIRECTV Group Holdings, LLC and AT&T Inc. will and hereby do move the Court for the dismissal of Plaintiff's Complaint (Dkt. No. 1) for failure to state a claim upon which relief can be granted, on the grounds that the Government has failed to sufficiently plead a claim for violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

This Motion is based on this Notice of Motion, the Memorandum that follows, all pleadings and records on file in this action, and any other papers and arguments presented to this Court at or before the hearing on this Motion.

Dated: January 10, 2017

ROBERT C. WALTERS
M. SEAN ROYALL
MARCELLUS MCRAE
KATHERINE V.A. SMITH
GIBSON, DUNN & CRUTCHER LLP


By: _/s/ M. Sean Royall_
     M. Sean Royall

Attorneys for Defendants
DIRECTV GROUP HOLDINGS, LLC,
and AT&T INC.,

1

# **TABLE OF CONTENTS**

I.    INTRODUCTION .................................................................................... 1

    A.    Time Warner Cable and the Dodgers Channel ............................ 1

    B.    Public Reaction to the Dodgers Channel .................................... 2

    C.    The Government's Complaint ........................................................ 3

II.   SUMMARY OF ALLEGATIONS ......................................................... 4

    A.    Key Factual Allegations ............................................................... 4

    B.    What the Government Does Not Allege ........................................ 7

III.  LEGAL STANDARD ............................................................................. 8

IV.   ARGUMENT ........................................................................................... 8

    A.    Antitrust Law Has Limited Applicability to Claims of "Mere"
        Information Sharing ....................................................................... 9

    B.    The Government Has Not Plausibly Alleged That DIRECTV
        Agreed to Reciprocal Exchanges of Sensitive Competitive
        Information ................................................................................... 10

    C.    The Complaint Fails to Plausibly Allege the Anticompetitive
        Effects Required by the Rule of Reason .................................... 16

        1.    The Complaint Does Not Allege Direct Evidence of Actual
            Anticompetitive Effects .................................................... 17

        2.    The Complaint Fails to Plausibly Allege "Likely"
            Anticompetitive Effects .................................................... 18

            a.    The Government Fails to Allege Market Power Over
                TWC in the Relevant Market .................................. 19

            b.    The Government Has Not Plausibly Alleged That the
                Challenged Conduct Is of the Sort Likely to Harm
                Competition .......................................................... 22

        3.    The Complaint Fails to Plausibly Allege Causation .................... 23

V.    CONCLUSION ..................................................................................... 24

2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Gibson, Dunn &
Crutcher LLP

i

# **TABLE OF AUTHORITIES**

**Cases**

*Ashcroft v. Iqbal*,
    556 U.S. 662, 129 S.Ct. 1937 (2009) ..................................................... 8, 11

*In re Baby Food Antitrust Litig.*,
    166 F.3d 112 (3d Cir. 1999) ............................................................. 8, 9, 13

*Bell Atlantic Corp. v. Twombly*,
    550 U.S. 544, 127 S.Ct. 1955 (2007) ................................................. 8, 10

*Bhan v. NME Hosps., Inc.*,
    929 F.2d 1404 (9th Cir. 1991) ................................................................. 16

*Black v. JP Morgan Chase & Co.*,
    2011 WL 4102802 (W.D. Pa. Aug. 10, 2011) ......................................... 14

*Blomkest Fertilizer, Inc. v. Potash Corp. of Saskatchewan*,
    203 F.3d 1028 (8th Cir. 2000) ................................................................. 14

*Brantley v. NBC Universal, Inc.*,
    675 F.3d 1192 (9th Cir. 2012) ..................................................... 9, 16, 24

*Burtch v. Milberg Factors, Inc.*,
    662 F.3d 212 (3d Cir. 2011) ..................................................................... 11

*Cason-Merenda v. Detroit Med. Ctr.*,
    862 F. Supp. 2d 603 (E.D. Mich. 2012) ........................................... 10, 17

*In re Century Aluminum Co. Sec. Litig.*,
    729 F.3d 1104 (9th Cir. 2013) ..................................................... 15, 16, 23

*Champagne Metals v. Ken-Mac Metals, Inc.*,
    458 F.3d 1073 (10th Cir. 2006) ............................................................... 10

*Cont'l Cablevision of Ohio, Inc. v. Am. Elec. Power Co.*,
    715 F.2d 1115 (6th Cir. 1983) ................................................................. 11

*Craftsmen Limousine, Inc. v. Ford Motor Co.*,
    491 F.3d 380 (8th Cir. 2007) ................................................................... 17

*Dickson v. Microsoft Corp.*,
    309 F.3d 193 (2d Cir. 2002) ..................................................................... 21

Gibson, Dunn &
Crutcher LLP

*Eclectic Props. East, LLC v. Marcus & Millichap Co.*,
  751 F.3d 990 (9th Cir. 2014) ................................................................ 8, 15

*FTC v. Ind. Fed'n of Dentists*,
  476 U.S. 447, 106 S. Ct. 2009 (1986) ........................................................ 23

*Gray v. Shell Oil Co.*,
  469 F.2d 742 (9th Cir. 1972) ............................................................ 11, 22

*Hanger v. Berkley Grp., Inc.*,
  No. 13-cv-113, 2015 WL 3439255 (W.D. Va. May 28, 2015) ............................... 21

*In re Houston Reg'l Sports Network, L.P.*,
  No. 13-35998 (Bankr. S.D. Tex. 2013) ..................................................... 15

*Int'l Norcent Tech. v. Koninklijke Philips Elecs. N.V.*,
  No. CV 07-000043-MMM, 2007 WL 4976364 (C.D. Cal. Oct. 29,
  2007) ........................................................................................... 24

*Jacobs v. Tempur-Pedic Int'l, Inc.*,
  626 F.3d 1327 (11th Cir. 2010) ............................................................ 19

*Krehl v. Baskin-Robbins Ice Cream Co.*,
  No. CV 76-1797-DWW, 1979 WL 1662 (C.D. Cal. Aug. 7, 1979),
  *aff'd*, 664 F.2d 1348 (9th Cir. 1982) ................................................. 11, 13

*Landers v. Quality Commc'ns, Inc.*,
  771 F.3d 638 (9th Cir. 2014) ............................................................... 8

*Leegin Creative Leather Prods., Inc. v. PSKS, Inc.*,
  551 U.S. 877, 127 S.Ct. 2705 (2007) ...................................................... 16

*In re Musical Instruments and Equip. Antitrust Litig.*,
  798 F.3d 1186 (9th Cir. 2015) ............................................................. 16

*Name.Space, Inc. v. Internet Corp.*,
  795 F.3d 1124 (9th Cir. 2015) ......................................................... 15, 16

*Nat'l Soc. of Prof'l Engineers v. United States*,
  435 U.S. 679 (1978)........................................................................ 16

*Newcal Indus., Inc. v. IKON Office Solutions*,
  513 F.3d 1038 (9th Cir. 2008) ............................................................ 21

Gibson, Dunn &
Crutcher LLP

*Oltz v. St. Peter's Cmty. Hosp.*,
   861 F.2d 1440 (9th Cir. 1988) ...................................................................17

*Oreck Corp. v. Whirlpool Corp.*,
   639 F.2d 75 (2d Cir. 1980) .......................................................................15

*R.C. Dick Geothermal Corp. v. Thermogenics, Inc.*,
   890 F.2d 139 (9th Cir. 1989) ....................................................................17

*Ralph C. Wilson Indus. v. Chronicle Broad. Co.*,
   794 F.2d 1359 (9th Cir. 1986) ..................................................................15

*Rick-Mik Enters. Inc. v. Equillon Enters. LLC*,
   532 F.3d 963 (9th Cir. 2008) ....................................................................19

*Santiago v. Warminster Twp.*,
   629 F.3d 121 (3d Cir. 2010) .......................................................................8

*Tanaka v. Univ. of S. Cal.*,
   252 F.3d 1059 (9th Cir. 2001) ....................................................................9

*Texaco Inc. v. Dagher*,
   547 U.S. 1, 126 S.Ct. 1276 (2006) .............................................................8

*Thurman Indus., Inc. v. Pay 'N Pak Stores, Inc.*,
   875 F.2d 1369 (9th Cir. 1989) .............................................................18, 19

*Todd v. Exxon*,
   275 F.3d 191 (2d Cir. 2001) ..............................................10, 17, 20, 21, 22

*Treasure Valley Potato Bargaining Ass'n v. Ore-Ida Foods, Inc.*,
   497 F.2d 203 (9th Cir. 1974) ....................................................................24

*Twin City Sportservice, Inc. v. Charles O. Finley & Co., Inc.*,
   512 F.2d 1264 (9th Cir. 1982) ..................................................................21

*United States v. Apple Inc.*,
   952 F. Supp. 2d 638 (S.D.N.Y. 2013), *aff'd* 791 F.3d 290 (2d Cir.
   2015) .......................................................................................................15

*United States v. Container Corp.*,
   393 U.S. 333, 89 S.Ct. 510 (1969) .................................................10, 13, 22

*United States v. U.S. Gypsum Co.*,
   438 U.S. 422, 98 S.Ct. 2864 (1978) .......................................................9, 23

iv

*United States v. Visa U.S.A. Inc.*,
    163 F. Supp. 2d 322 (S.D.N.Y. 2001) ...................................................................... 18

**Other Authorities**

Claire Atkinson & Josh Kosman, "Pay-TV Providers Playing Hardball on
    TWC Sports Channel," N.Y. POST (Nov. 28, 2013)...................................................... 2

Cox Availability Map, http://www.cabletv.com/cox/availability-map ........................... 6

DOJ & FTC, *Statements of Antitrust Enforcement Policy in Health Care*
    (Aug. 1996), *available at*
    https://www.ftc.gov/sites/default/files/attachments/competition-policy-
    guidance/statements_of_antitrust_enforcement_policy_in_health_care
    _august_1996.pdf........................................................................................................ 22

Joe Flint, "Fans May Strike Out in Battle Over Dodgers' New TV Home,"
    L.A. TIMES (Feb. 18, 2014),
    http://www.latimes.com/entertainment/envelope/cotown/la-et-ct-
    dodger-tv-20140218-story.html .................................................................................... 2

Ken Gurnick, "Dodgers to Launch Network with Time Warner TV Deal,"
    MLB.COM, http://m.mlb.com/news/article/41215548/dodgers-to-
    launch-network-with-time-warner-tv-deal .................................................................. 1

Mike Reynolds, "Analysis: TWC's Dodgers Deal an RSN Game-
    Changer," MULTICHANNEL NEWS (Jan. 25, 2013),
    http://www.multichannel.com/news/content/analysis-twcs-dodgers-
    deal-rsn-game-changer/359387 .............................................................................. 1, 4

Gibson, Dunn &
Crutcher LLP

## MEMORANDUM OF POINTS AND AUTHORITIES

### I.      INTRODUCTION

Defendants respect the important role that the Antitrust Division of the Department of Justice plays in enforcing our nation's antitrust laws for the benefit of consumers.  But those laws have well-established limits.  When the Government reaches beyond those limits to challenge independent business decisions that help, rather than harm, consumers, its claims should be scrutinized with particular care.  Here, the Government's Complaint cannot withstand that scrutiny and should be dismissed as a matter of law.

### A.      Time Warner Cable and the Dodgers Channel

At all times relevant to the Complaint, Time Warner Cable ("TWC") has been the largest pay-TV provider in Los Angeles, where other providers include Cox Communications, Charter Communications, AT&T U-verse, DIRECTV, Verizon FiOS, and DISH.[1]  In the industry, pay-TV providers are often called "multi-channel video programming distributors," "MVPDs," or simply "distributors" because they distribute television content to consumers willing to pay for the service.

In January 2013, TWC outbid Fox Sports for the local broadcast rights to LA Dodgers baseball games.  To secure those rights, TWC reportedly paid a record price of $7-8 billion, which was 700% higher annually than the Dodgers' prior rights deal with Fox Sports.[2]  Then, in an effort to cover its extravagant bet, TWC created a new "Dodgers-only" channel (the "Dodgers Channel") that could be sold to each of LA's other distributors and, in turn, to LA-area consumers at dramatically higher prices.

---

[1] Time Warner Cable is an entirely separate company from Time Warner Inc., the media and entertainment company that AT&T agreed to acquire in October 2016.

[2] Mike Reynolds, "Analysis: TWC's Dodgers Deal an RSN Game-Changer," MULTICHANNEL NEWS (Jan. 25, 2013), http://www.multichannel.com/news/content/analysis-twcs-dodgers-deal-rsn-game-changer/359387 ($7-$8 billion deal for Dodgers rights would "mark a record for a local/regional rights pact"); Ken Gurnick, "Dodgers to Launch Network with Time Warner TV Deal," MLB.COM, http://m.mlb.com/news/article/41215548/dodgers-to-launch-network-with-time-warner-tv-deal.

1   Unfortunately for TWC, its high-risk gamble came at a bad time.  With the cost of
2   sports content skyrocketing generally, distributors in Los Angeles and elsewhere were
3   having to make hard choices about the content they would carry and the content they
4   would forego.  Consumers were (and still are) weary of higher TV bills, and
5   distributors simply could not afford to pay high prices for content that most subscribers
6   would not be willing to pay for as well.

7   **B.    Public Reaction to the Dodgers Channel**

8          Against these market realities, a very public discussion ensued over whether
9   other LA-area distributors—and ultimately consumers—would agree to foot the bill
10  for TWC's historic investment in Dodgers baseball.  As the Complaint explains, LA-
11  area distributors had been "burned" by TWC's expensive Lakers Channel in 2012,
12  Compl. ¶ 39, when TWC overpaid for carriage only to see the team's performance and
13  ratings tank.  Therefore, each distributor had its own independent reasons not to
14  overpay for another single-team sports channel.  Nevertheless, when TWC offered the
15  Dodgers Channel to other distributors, the media reported that TWC was demanding
16  licensing fees close to "$5 a month per subscriber."[3]  That is $5 a month for *every*
17  subscriber in Los Angeles, not just those who wanted to watch the Dodgers, for a
18  single channel covering a single team with live programming only six months out of
19  the year.

20         As negotiations continued, it was publicly reported that LA-area distributors
21  were balking at TWC's price demands.  News articles in November 2013 reported that
22  several distributors were unlikely to carry the Dodgers Channel "because of the
23  costs."[4]  To this day, in fact, no distributor unaffiliated with TWC carries the Dodgers

24  ─────────────────────

25  [3] Joe Flint, "Fans May Strike Out in Battle Over Dodgers' New TV Home," L.A.
26  TIMES (Feb. 18, 2014), http://www.latimes.com/entertainment/envelope/cotown/la-
    et-ct-dodger-tv-20140218-story.html.

27  [4] Claire Atkinson & Josh Kosman, "Pay-TV Providers Playing Hardball on TWC
    Sports Channel," N.Y. POST (Nov. 28, 2013), http://nypost.com/2013/11/28/pay-tv-
28  providers-playing-hardball-on-twc-sports-channel/.

Channel.  Verizon FiOS[5] and DISH, which are not alleged to have been involved in any supposedly improper conduct, have never carried the channel.

## C.   The Government's Complaint

In its Complaint, the Government blames the market's rejection of the Dodgers Channel not on TWC—which insisted on historically high license fees from other distributors and their subscribers—but on four of the other LA-area distributors:  Cox Communications, Charter Communications, DIRECTV, and AT&T.  But even after an extensive pre-complaint investigation in which the Government had full access to party documents and took numerous depositions of current and former TV executives, the Complaint does not allege any traditional theory of antitrust liability.  It does *not* allege that any of these four distributors agreed to boycott the Dodgers Channel or coordinate on the prices they would offer or accept in their negotiations with TWC.  Likewise, the Complaint does *not* assert that there were any communications (much less agreements) among them about any distributor's valuation of the Dodgers Channel or, for that matter, the terms of any distributor offer or counteroffer.  And the Complaint does *not* allege that, "but for" the claimed conduct, any party would have made different decisions about carrying the Dodgers Channel.  The facts adduced in the Government's investigation of this matter simply would not support these allegations.

As a result, the Government rests its Complaint only on narrow and generalized allegations of "information sharing."  In particular, the Complaint alleges three separate "bilateral" agreements to share information between DIRECTV and each of the other three distributors.  Each bilateral agreement, the Government alleges, involved the sharing of "non-public," "competitively sensitive information" "about the status" of the distributors' carriage negotiations for the Dodgers Channel.  Compl. ¶¶ 4-5.

---

[5] Verizon subsequently sold its LA video distribution business to Frontier Communications, which also independently decided not to carry the Dodgers Channel on the terms demanded by TWC.

Gibson, Dunn &
Crutcher LLP

Antitrust challenges based solely on alleged agreements to "share information" are extremely rare, and for good reason.  Never before has a court found antitrust liability for the mere sharing of non-price information of the type alleged here, especially when based on such threadbare allegations of an agreement.  Moreover, there is nothing in the Complaint that contradicts the obvious alternative explanation that DIRECTV and other distributors independently analyzed the value of the Dodgers Channel to their subscribers, tried to negotiate reasonable terms with TWC in good faith, and reached the same fundamental conclusion that TWC's price demands were too high.  Section 1 of the Sherman Act requires far more to support a lawsuit.  At a minimum, the plaintiff must plausibly plead both an agreement in restraint of trade and anticompetitive effects in a properly defined relevant market.  For the reasons discussed below, the Government's Complaint does neither and should be dismissed as a matter of law.

## II.     SUMMARY OF ALLEGATIONS

The Complaint is telling both in what it alleges and what it does not allege.[6]

### A.     Key Factual Allegations

In January 2013, TWC acquired exclusive rights for the local telecast of Dodgers games beginning in the 2014 season.  Compl. ¶¶ 3, 29 n.3, 40.  While the Complaint does not mention what TWC paid for those rights, it was widely reported to be a record high price.[7]  TWC, the largest cable company in LA, then turned around in January 2014 and offered to sublicense those rights to other video distributors in the

---

[6] The following facts relevant to this Motion to Dismiss are taken from Plaintiff's Complaint without admitting or denying their veracity.

[7] *See, e.g.*, Mike Reynolds, "Analysis: TWC's Dodgers Deal an RSN Game-Changer," MULTICHANNEL NEWS (Jan. 25, 2013), http://www.multichannel.com/news/content/analysis-twcs-dodgers-deal-rsn-game-changer/359387 ($7-$8 billion deal for Dodgers rights would "mark a record for a local/regional rights pact").

LA area.  *Id.* ¶ 40.  This included the two satellite providers, DISH and DIRECTV, cable companies Cox and Charter, and telcos AT&T and Verizon.  *Id.* ¶¶ 6, 108.[8]

The Complaint states that TWC demanded these MVPDs pay a reported $5 per month for every subscriber in the LA area, *id.* ¶ 40, regardless of whether these subscribers watched Dodgers games or not.  TWC did so at a time when distributors were uniformly concerned about "the rising cost of [sports] content."  *Id.* ¶ 28.  In view of this fact, the internal analysis used to brief DIRECTV's CEO pointed out one reason not to overpay for the Dodgers was to avoid "set[ting] a bad precedent and embolden[ing] other rights holders (not just confined to sports)" in a manner that would "lead to higher content costs over time."  *Id.* ¶ 55.

DIRECTV's internal financial analysis showed that TWC's price far exceeded the channel's value to its subscribers.  *Id*. ¶ 52.  The CEO decided the company should try to negotiate a lower price, and DIRECTV proceeded to negotiate with TWC, making counteroffers at lower rates.  *Id.* ¶ 56.  Yet TWC insisted on the same price from all MVPDs, and told them it could not reduce the price for one without giving that price to all.  *Id.* ¶ 98.

Not surprisingly, given TWC's intransigence, none of the other LA MVPDs reached agreement with TWC on commercial terms for carriage of the Dodgers Channel.  *Id.* ¶ 63.  Cox, which operates what the Complaint characterizes as a geographically concentrated, *id.* ¶ 7, cable network in Orange County, "concluded [it] should decline carrying the network," *id*. ¶ 66.  Charter, which had publicly announced it was divesting its LA-area cable operations to Comcast, decided to "sit[] this one out."  *Id.* ¶ 46.  And AT&T's content executives "recommended not launching [the Dodgers Channel] unless TWC reduces its rate materially."  *Id.* ¶ 97.

The Complaint also acknowledges that distributors were "burned" by their prior experience with TWC's Lakers Channel, *id.* ¶ 39, in which they paid a high asking

---

[8] AT&T did not acquire DIRECTV until July 2015, so they were separate companies until then.

1   price only to see the team's performance and ratings tank.  Consequently, each MVPD

2   independently had every reason not to overpay for another single-team sports channel.

3   And the Complaint concedes that DISH and Verizon, both major LA-area distributors,

4   also refused to pay TWC's price for the Dodgers Channel, *id.* ¶¶ 63, 108, but does not

5   allege any improper contacts involving either.  Indeed, despite the fact that the

6   Complaint does not allege any improper communications after June 2014, LA-area

7   distributors (including Verizon and DISH) made the same decisions in 2015 and 2016:

8   "[t]o this day, TWC and its affiliates remain the only LA area video distributors that

9   carry the Dodgers Channel[.]"  *Id.* ¶ 44.

10       In the face of all these allegations of good-faith valuation and negotiation, which

11   point to independent reasons each distributor had for not acceding to TWC's inflated

12   price, the Complaint nevertheless asserts that separate, bilateral communications

13   between DIRECTV and three other distributors amounted to "agreements" to share

14   information that somehow "corrupted . . . the competitive process" of negotiating with

15   TWC.  *Id.* ¶ 2.  There is no direct evidence that most of the alleged communications

16   involved the Dodgers negotiations.  In a year-long investigation, the Government

17   identified only *three* such conversations that even mention the Dodgers negotiations

18   explicitly—two involving Cox, one involving Charter, and none involving AT&T.

19   And the Government does not allege that any of these alleged conversations included

20   reference to specific information about the price or terms of counteroffers or about

21   negotiating strategy.  *Id.* ¶¶ 48, 74-75, 86.

22       The Complaint alleges anticompetitive effects only inferentially.  It begins by

23   defining relevant antitrust markets for "video distribution services" sold *downstream* to

24   consumers within the limited geographic territories of two cable companies, Cox and

25   Charter.[9]  *Id.* ¶¶ 102-109.  The Complaint then alleges "market power" over consumers

26

27   _____

28   [9] Cox serves parts of Orange County and Charter's footprint included parts of
     Malibu and Long Beach.  *See* Cox Availability Map,
     http://www.cabletv.com/cox/availability-map.

who "faced limited choices," *id.* ¶¶ 114, 117, and combined subscribers shares allegedly above 75% in one area and 55% in the other, *id.* ¶¶ 116, 119.  And finally, it alleges that the communications were "likely" to "taint[]" the "competitive process" of negotiations, through "dampened . . . incentives" and "reduced . . . uncertainty."  *Id.* ¶¶ 121, 126-28.  Despite a focus on alleged competitive harm in the *upstream* marketplace where "[v]ideo distributors acquire the rights to transmit video content from programmers," *id.* ¶¶ 2, 102, there are no allegations of market shares or market power involving the purchase of programming from TWC.  *Id.* ¶¶ 101-25.

## B.  What the Government Does Not Allege

There is also great significance in what this Complaint does *not* allege.  Again, a large team of government lawyers had a year of one-sided discovery from all parties, and filed a 56-page Complaint with detailed allegations that hold nothing back.  In such circumstances, the following omissions underscore the factual shortcomings of the Government's Complaint:

- There is no allegation referring to a single document that constitutes, or explicitly refers to, an agreement to exchange competitively sensitive information about the Dodgers negotiations.  No email, text message, or internal memo says anything of the sort.  The Complaint asserts only that sporadic communications somehow "demonstrate" the agreements.  *Id.* ¶ 17.

- There is no allegation of any multilateral agreement or communications regarding the Dodgers Channel negotiations (or anything else).

- There is no allegation that DIRECTV's (or others') negotiations with TWC for carriage of the Dodgers Channel were not in good faith.

- There is no allegation of improper communications or agreement with Verizon or DISH (who are both larger than Cox or Charter in LA and who to this day do not carry the Dodgers Channel).

- There is no allegation that any MVPD, or combination of any two MVPDs, had market power over TWC, as a seller of video content, which would be

1        necessary to support allegations of harm to the "competitive process" for

2        purchasing programming.

3        • And there is no allegation that any distributor would carry the Dodgers

4          Channel today "but for" the alleged communications.

5  One would expect to see such points in any rule of reason complaint plausibly alleging

6  agreements to exchange competitive information that caused competitive harm.  Yet

7  the Court will search in vain to find such allegations here.

8  ## III.   LEGAL STANDARD

9        Given that the Government has used compulsory process to conduct more than a

10  year of pre-complaint discovery involving substantial document productions and

11  multiple depositions, the Supreme Court's decisions in *Bell Atlantic Corp. v. Twombly*,

12  550 U.S. 544, 127 S.Ct. 1955 (2007), and *Ashcroft v. Iqbal*, 556 U.S. 662, 129 S.Ct.

13  1937 (2009), should apply with particular force.  Even a private plaintiff with no such

14  advance information must plead "more than a sheer possibility that a defendant has

15  acted unlawfully."  *Landers v. Quality Commc'ns, Inc.*, 771 F.3d 638, 641 (9th Cir.

16  2014) (citations omitted).  "Plausibility" is "the touchstone for pleading sufficiently

17  after *Twombly* and *Iqbal*."  *Santiago v. Warminster Twp.*, 629 F.3d 121, 133 (3d Cir.

18  2010).  But "allegations . . . [that] are no more than conclusions are not entitled to the

19  assumption of truth."  *Eclectic Props. East, LLC v. Marcus & Millichap Co.*, 751 F.3d

20  990, 996 (9th Cir. 2014) (citation omitted).  And further, "[w]hen considering

21  plausibility, courts must also consider" any "'obvious alternative explanation' for

22  defendant's behavior."  *Id.* (citation omitted).

23  ## IV.   ARGUMENT

24        Section 1 claims challenging alleged information sharing between or among

25  competitors are subject to rule of reason analysis.  *In re Baby Food Antitrust Litig.*,

26  166 F.3d 112, 118 (3d Cir. 1999).  Under the rule of reason, an "antitrust plaintiff[]

27  must demonstrate that a particular contract or combination is in fact unreasonable and

28  anticompetitive before it will be found unlawful."  *Texaco Inc. v. Dagher*, 547 U.S. 1,

1   5, 126 S.Ct. 1276, 1277 (2006).  The elements of such a claim are "(1) a contract,

2   combination or conspiracy [*i.e.*, agreement] among two or more persons or distinct

3   business entities; (2) by which the persons or entities intended to harm or restrain trade

4   or commerce among the several States . . . ; (3) which actually injures competition."

5   *Brantley v. NBC Universal, Inc.*, 675 F.3d 1192, 1197 (9th Cir. 2012).  With regard to

6   the third element, "[t]he plaintiff bears the initial burden of showing that the restraint

7   produces 'significant anticompetitive effects' within a 'relevant market.'"  *Tanaka v.*

8   *Univ. of S. Cal.*, 252 F.3d 1059, 1063 (9th Cir. 2001).

9        The Government's Complaint fails on at least two essential elements of its

10   Section 1 claims:  the Government has not plausibly alleged that the supposedly

11   conspiring distributors entered into unlawful agreements in restraint of trade, or that

12   their conduct caused any legally cognizable anticompetitive effects.

13   **A.   Antitrust Law Has Limited Applicability to Claims of "Mere" Information**

14   **Sharing**

15        "Mere exchanges of information" are treated differently under the antitrust laws

16   than information exchanges used to facilitate a price-fixing agreement, which the

17   Government has not alleged here.  *See In re Baby Food Antitrust Litig.*, 166 F.3d at

18   118.  The Supreme Court has cautioned that such exchanges of information, even price

19   information, fall into a "gray zone . . . lying close to the borderline" between

20   permissible and impermissible conduct.  *United States v. U.S. Gypsum Co.*, 438 U.S.

21   422, 441, 98 S.Ct. 2864, 2875 (1978).  As the Court made clear in *Gypsum*:  "The

22   exchange of price data and other information among competitors does not invariably

23   have anticompetitive effects; indeed, such practices can in certain circumstances

24   increase economic efficiency and render markets more, rather than less, competitive."

25   *Id.* at 443 n.16.

26        In the rare circumstance where challenges to mere information sharing have

27   been allowed to proceed, they have involved the reciprocal sharing, among a broad

28   contingent of key competitors, of highly sensitive, non-public *price* information, in a

regular and systematic way over a sustained period of time.  *See, e.g.*, *United States v. Container Corp.*, 393 U.S. 333, 335-36, 89 S.Ct. 510, 511-12 (1969) (involving an eight-year reciprocal agreement among competing producers of corrugated boxes to exchange "current pric[ing]" information "whenever requested"); *Todd v. Exxon*, 275 F.3d 191, 195-97 (2d Cir. 2001) (involving a "regular" exchange of detailed "current and future" employee salary and benefits information among companies representing "80-90% of the industry's revenues" over a seven-year period); *Cason-Merenda v. Detroit Med. Ctr.*, 862 F. Supp. 2d 603, 629 (E.D. Mich. 2012) (a "substantial body of evidence revealed the Defendant hospitals' regular requests for and exchange of competitively sensitive information" regarding nurses' salaries).  No court has ever found an unlawful agreement based on the type of sporadic, high-level, non-price-related communications alleged here.

## B.   The Government Has Not Plausibly Alleged That DIRECTV Agreed to Reciprocal Exchanges of Sensitive Competitive Information

"The essence of a claim of violation of Section 1 of the Sherman Act is the agreement itself."  *Champagne Metals v. Ken-Mac Metals, Inc.*, 458 F.3d 1073, 1082 (10th Cir. 2006) (citation omitted).  And the law is clear that allegations of parallel conduct alone are not sufficient to establish the agreement element of a Section 1 claim.  *Twombly*, 550 U.S. at 552.  That point is particularly important here, where there are clear independent reasons for the parties' actions.  *See id*. at 557 (allegations of parallel conduct "must be placed in a context that raises a suggestion of a preceding agreement, not merely parallel conduct that could just as well be independent action"); *see also id*. at 554 (parallel conduct may "just as much [be] in line with a wide swath of rational and competitive business strategy unilaterally prompted by common perceptions of the market").

The Government has not met this threshold pleading standard.  For each of the separate bilateral information sharing agreements alleged, the Complaint makes the same conclusory claim:  the parties' "exchanges of information demonstrate their

1    agreement and reflect concerted action between horizontal competitors."  Compl.

2    ¶¶ 65, 77, 89; *see also id.* ¶ 17 (same).  Such "[t]hreadbare recitals" do nothing to

3    "plausibly give rise to an entitlement to relief" and warrant no assumption of truth.

4    *Iqbal*, 556 U.S. at 678-79.  Rather, these circular "communications = information

5    exchange = agreement" allegations reveal a fundamental flaw in the Government's

6    entire approach to alleging concerted action in this case.

7         As a matter of law, general allegations of competitor communications do not

8    suffice in themselves to plead information exchanges, let alone an anticompetitive

9    agreement.  *See, e.g.*, *Gray v. Shell Oil Co.*, 469 F.2d 742, 745-46 (9th Cir. 1972)

10   (affirming dismissal because, although defendant "obtain[ed] wholesale price

11   information from other major oil companies . . . there was no agreement . . . between

12   the companies to exchange such information"); *Burtch v. Milberg Factors, Inc.*, 662

13   F.3d 212, 226 (3d Cir. 2011) (affirming dismissal and rejecting argument that "the

14   mere exchange of future information is enough to constitute a violation of the Sherman

15   Act"); *Cont'l Cablevision of Ohio, Inc. v. Am. Elec. Power Co.*, 715 F.2d 1115, 1119

16   (6th Cir. 1983) ("exchange of price data" did "not offend §1" given "the absence of . . .

17   an actual agreement to restrain competition").

18        Rather, courts have allowed information exchange cases under Section 1 to

19   proceed only where they involved a demonstrated pattern of sharing non-public,

20   competitively sensitive price information, in a manner reflecting a conscious

21   commitment to ongoing, reciprocal exchanges.  *E.g.*, *Krehl v. Baskin-Robbins Ice*

22   *Cream Co.*, No. CV 76-1797-DWW, 1979 WL 1662, *11 (C.D. Cal. Aug. 7, 1979)

23   (dismissing Section 1 information sharing claim where plaintiffs did "not establish[] a

24   reciprocal understanding among defendants to exchange price information"), *aff'd*, 664

25   F.2d 1348 (9th Cir. 1982); *Gray*, 469 F.2d at 745-47 (finding no liability where

26   information sharing was not "systematic" and there was no "reciprocal

27   understanding").

28

The Government here asks this Court to dramatically expand the scope of Section 1's application to mere information exchanges, extending the law's reach far beyond the narrow circumstances in which it has previously been applied relating to current or future price information. Yet it does not come close to alleging that any communications between DIRECTV and any other individual distributor were of comparable competitive sensitivity to price, or that the exchanges were sufficiently long-standing, systematic, or reciprocal to meet the legal standard for agreement. The Complaint instead relies on allegations of only a handful of episodic, separate contacts between DIRECTV and three other distributors. Peeling back the layers of redundant allegations reveals how few of the alleged communications have any clear, direct connection to the Dodgers. To be exact, there are only *three* such conversations, one of which has two elements:

(1)   a DIRECTV executive's alleged statement to his Cox counterpart that DIRECTV was not the distributor that TWC claimed was close to signing a Dodgers deal;

(2)   alleged statements by the same two individuals in the same conversation that they would "give one another a 'heads-up' before launching the Dodgers Channel";

(3)   DIRECTV's alleged offer to give Cox "an opportunity to sign a Dodgers Channel deal with TWC first"; and

(4)   a brief discussion between DIRECTV and a Charter employee commenting on TWC's "outrageous" carriage rates for the Dodgers.

Compl. ¶ 48.

Even taking these allegations at face value, none plausibly supports the existence of a reciprocal agreement to exchange sensitive competitive price information. Item (1) involves a unilateral statement of current status (*i.e.*, DIRECTV was not the distributor TWC alleged was close to signing) to Cox, without alleging that this or any other statement related to future plans, much less created an "expectation

1   that . . . reciprocal information" would be provided in return.  *Container Corp.*, 393

2   U.S. at 335.  As to Item (2), regarding a "'heads-up' before launching the Dodgers

3   Channel," the Government does not allege that such a communication ever happened

4   (or was reciprocal).  Compl. ¶ 48.  But even more revealing is the Complaint's careful

5   choice of words.  The Government does not allege that the two MVPDs agreed to

6   provide a warning before *signing* a Dodgers deal.  The only contention is that they

7   agreed to provide notice "before *launching* the Dodgers Channel"—*i.e.*, notice *after*

8   signing in the brief time before the signed agreement was publicly announced.  *Id.*

9   (emphasis added).  Nothing in the Complaint suggests that a one-way communication

10  about a signed agreement, made after the fact, would have been the sort of

11  competitively sensitive information that could trigger antitrust liability, or that

12  anything about this communication even remotely suggests any reciprocal agreement

13  or understanding.

14        Item (3) involves an alleged unilateral offer to provide advance notice before

15  DIRECTV signed a Dodgers carriage agreement, without alleging that any such offer

16  was accepted, or that such notice was ever provided.  Item (4) involves only the most

17  general statement about TWC's "outrageous" pricing demands, as part of a broader

18  discussion of "the high cost of sports programming."  Compl. ¶ 86.  There is no

19  allegation that DIRECTV and Charter employees shared information about *their own*

20  prices or counteroffers, and TWC's price demands for the Dodgers Channel had been

21  the subject of public media reports dating back to January 2013.  *See id.* ¶ 40.  Such

22  statements amount to nothing more than industry chatter about high-visibility topics,

23  and cannot be sufficient to plausibly allege an ongoing reciprocal agreement to share

24  competitively sensitive information.[10]   In fact, as the Complaint acknowledges, it was

25  

26  [10] *See Krehl*, 664 F.2d at 1357 (upholding dismissal where "isolated
    communications regarding prices" that were challenged involved "no more than
27  idle 'shop talk'" among "persons with no direct pricing responsibilities"); *In re
    Baby Foods Antitrust Litig.*, 166 F.3d at 133, 135 (concluding that "chit chat . . .
28  among persons with no pricing authority" was "far removed from a concerted

widely known that distributors regarded TWC's Dodgers licensing demands to be unreasonable. *Id.* ¶ 61 (distributor "opposition to carrying the Dodgers Channel" was "regularly touted . . . in the press").

The remaining communications in the Complaint are facially neutral, *i.e.*, telephone calls and text messages about talking later ("got a sec") or general topics like "sports." *Id.* ¶¶ 96, 99. Because the Government has no basis to allege any direct connection to the Dodgers negotiations, it relies on speculative allegations that these communications *could have* included discussion of the Dodgers negotiations based on the timing in relation to "important points in the negotiations with TWC." *Id.* ¶ 10. The Government places greatest weight upon a text message exchange between DIRECTV and AT&T executives during which the AT&T executive allegedly states, "Forgot to tell you but we got a [##] mph pitch yesterday," later asking, "Consistent with what you got?" *Id.* ¶ 99. The DIRECTV executive is alleged to have responded, "Hope u hit it out!" *Id.* The Complaint alleges that this exchange can be interpreted as somehow referring to TWC's "initial asking price." *Id.* Beyond that speculation, nothing about this text exchange suggests the existence of a reciprocal information sharing agreement. On the contrary, the only thing one can tell for certain is that DIRECTV was asked for information ("Consistent with what you got?") but specifically *declined* to provide any. *See Black v. JP Morgan Chase & Co.*, 2011 WL 4102802, *22 n.25 (W.D. Pa. Aug. 10, 2011) (refusing to infer unlawful agreement where "factual allegations" did not "show or suggest an understanding or expectation of a reciprocal exchange of pricing information").

Such speculative assertions that facially neutral communications could possibly have included discussion of the Dodgers negotiations are precisely the type of allegations that courts routinely reject under *Twombly* and *Iqbal*, as they fail to account

reciprocal exchange of important pricing and marketing information"); *Blomkest Fertilizer, Inc. v. Potash Corp. of Saskatchewan*, 203 F.3d 1028, 1033 (8th Cir. 2000) (affirming summary judgment where a "high level of interfirm communications" and after-the-fact price verifications did not overcome sworn denials and were thus insufficient to raise an inference of conspiracy).

for obvious lawful explanations for the behavior.  *Eclectic Props.*, 751 F.3d at 995; *see also In re Century Aluminum Co. Sec. Litig.*, 729 F.3d 1104, 1108 (9th Cir. 2013) (if "plaintiffs' explanation is merely *possible* rather than plausible," dismissal is warranted (emphasis in original)).  While the Complaint offers one interpretation, it is not a plausible one, as there are other obvious lawful interpretations for these same communications.[11]  And the Ninth Circuit has held that courts "cannot . . . infer an anticompetitive agreement when factual allegations 'just as easily suggest rational, legal business behavior.'"  *Name.Space, Inc. v. Internet Corp.*, 795 F.3d 1124, 1130 (9th Cir. 2015) (citation omitted).  The Complaint offers *nothing* to suggest why these facially neutral communications should be viewed as an anticompetitive information sharing agreement as opposed to ordinary business or social behavior.

This flaw in the Complaint is exacerbated by the fact that the Government alleges nothing to suggest that the volume of contacts between these individuals in the period of interest was unusual, which its extensive pre-complaint investigation surely would have revealed.[12]  At most, therefore, the Government has alleged "opportunities to conspire," which falls well short of what is required to survive a Rule 12(b)(6) motion.  *See Ralph C. Wilson Indus. v. Chronicle Broad. Co.*, 794 F.2d 1359, 1365 (9th Cir. 1986) ("social and business contacts" that might arguably create "an opportunity to conspire" are "insufficient to establish a conspiracy").[13]

---

[11] For example, as the Complaint acknowledges, the DIRECTV and AT&T executives were "close" personal friends and former colleagues.  Compl. ¶ 90.  In addition, judicially noticeable facts show that DIRECTV and AT&T entered into a lawful joint venture to acquire the Houston RSN out of bankruptcy in 2014.  *See In re Houston Reg'l Sports Network, L.P.*, No. 13-35998 (Bankr. S.D. Tex. 2013).

[12] *Cf. United States v. Apple Inc.*, 952 F. Supp. 2d 638, 655 n.14 (S.D.N.Y. 2013) (emphasizing that "[t]he telephone calls among the Publisher Defendants during the period of their negotiations with Apple represented a departure from the ordinary pattern of calls among them"), *aff'd* 791 F.3d 290 (2d Cir. 2015).

[13] *See also Oreck Corp. v. Whirlpool Corp.*, 639 F.2d 75, 79 (2d Cir. 1980) ("A mere showing of close relations or frequent meetings between the alleged conspirators . . . will not sustain a plaintiff's burden absent evidence which would permit the inference that those close ties led to an illegal agreement.").

As the Ninth Circuit recently held, a complaint alleging that challenged actions "should be viewed as arising from a conspiratorial agreement because a conspiracy is *theoretically possible* . . . is not enough to state a §1 claim." *Name.Space*, 795 F.3d at 1131 (emphasis added). A court "cannot infer a conspiracy based on speculation," yet, when the rhetoric and conclusory assertions are stripped away, as *Twombly* and *Iqbal* require, that is all this Complaint alleges. *Id.* To satisfy Rule 12(b)(6), "[p]laintiffs must plead 'something more,' 'some further factual enhancement,' a 'further circumstance pointing toward a meeting of the minds' of the alleged conspirators." *In re Musical Instruments and Equip. Antitrust Litig.*, 798 F.3d 1186, 1193 (9th Cir. 2015) (citation omitted); *see also In re Century Aluminum Co. Sec. Litig.*, 729 F.3d at 1108 ("When faced with two possible explanations, . . . [s]omething more is needed, such as facts tending to exclude the possibility that the alternative explanation is true, in order to render plaintiff's allegations plausible within the meaning of *Iqbal* and *Twombly*."). The Government has failed to do so in this case, and its Complaint therefore should be dismissed.

## C.   The Complaint Fails to Plausibly Allege the Anticompetitive Effects Required by the Rule of Reason

The Supreme Court has long emphasized that "the purpose of the [rule of reason] analysis is to form a judgment about the competitive significance of the restraint." *Nat'l Soc. of Prof'l Engineers v. United States*, 435 U.S. 679, 692 (1978). To that end, "'[i]n its design and function the rule of reason distinguishes between restraints with anticompetitive effect that are harmful to the consumer and restraints stimulating competition that are in the consumer's best interest.'" *Brantley*, 675 F.3d at 1197 (quoting *Leegin Creative Leather Prods., Inc. v. PSKS, Inc.*, 551 U.S. 877, 886, 127 S.Ct. 2705, 2708 (2007)). For this reason, Section 1 claims subject to rule of reason analysis require pleading and proof of "a relevant market" and "actual effects . . . on competition in [that] relevant market." *Bhan v. NME Hosps., Inc.*, 929 F.2d 1404, 1410 (9th Cir. 1991). The Government's claims fail on both counts.

1

2

### 1.   The Complaint Does Not Allege Direct Evidence of Actual Anticompetitive Effects

3      The Government makes no attempt to allege that any distributor would be

4   carrying the Dodgers Channel today absent the alleged communications.  Rather, the

5   Complaint asserts only that the communications "*had the tendency* to reduce . . .

6   quality" and "*had the tendency* to reduce output."  Compl. ¶ 130 (emphasis added).

7   The Government later alleges that the supposed communications "had the *likely* and

8   foreseeable result of decreasing quality and reducing output."  *Id.* ¶¶ 134, 137, 140

9   (emphasis added).  But a tendency or likelihood is not an actuality:  "The mere fact

10  that the restrictions *may have* reduced demand . . . does not, without more, show an

11  actual, sustained adverse effect on competition in the market as a whole."  *Craftsmen*

12  *Limousine, Inc. v. Ford Motor Co.*, 491 F.3d 380, 390 (8th Cir. 2007) (emphasis

13  added); *see also R.C. Dick Geothermal Corp. v. Thermogenics, Inc.*, 890 F.2d 139, 153

14  (9th Cir. 1989) (affirming dismissal on the ground that that "there were no anti-

15  competitive effects *caused by* the defendants' conduct" (emphasis added)).

16      That is in sharp contrast to typical information sharing cases involving price,

17  where the complaints allege that the result of the communications was higher prices (or

18  lower purchase prices in buyer-side cases).  Reliance on direct evidence of actual harm

19  is common in cases, like this one, involving completed, past conduct, where any actual

20  competitive effects from the restraint (or lack thereof) should be observable.  *See, e.g.*,

21  *Oltz v. St. Peter's Cmty. Hosp.*, 861 F.2d 1440, 1446 (9th Cir. 1988) (relying on direct

22  evidence that prices "rose dramatically because of the challenged restraint").  Of

23  particular relevance here are buyer-side cases, such as *Todd v. Exxon*, where then-

24  Judge Sotomayor focused on the plaintiffs' specific allegations that salaries (*i.e.*, the

25  "price" of labor) were artificially depressed *because of* the information exchanges.

26  275 F.3d at 197, 214 (citing the complaint's specific allegations about the magnitude

27  of the decrease).  The same was true in *Cason-Merenda*, where the district court found

28  that the plaintiff identified a "sufficient basis for attributing this detrimental impact

1   [sub-competitive nursing wages] to Defendants' exchange of information regarding the

2   compensation paid to their RN workforces." 862 F. Supp. 2d at 648.

3          There is, however, no such causal link to actual competitive harm in this

4   Complaint, as the Government's lengthy investigation revealed no evidence supporting

5   such an impact. *See United States v. Visa U.S.A. Inc.*, 163 F. Supp. 2d 322, 329, 363

6   (S.D.N.Y. 2001) (rejecting DOJ antitrust claims where the agency argued that the

7   conduct at issue created "a reduced incentive" for competition but DOJ failed "to

8   demonstrate that [the conduct] *cause[d]* any adverse effect on competition" (emphasis

9   added)). In short, the Government does not allege any actual anticompetitive effects

10  resulting from the purported information exchange agreements—let alone "evidence

11  showing a clear competitive injury" caused by the conduct, as the Ninth Circuit

12  requires. *Thurman Indus., Inc. v. Pay 'N Pak Stores, Inc.*, 875 F.2d 1369, 1373 (9th

13  Cir. 1989).

14         **2.    The Complaint Fails to Plausibly Allege "Likely" Anticompetitive**

15             **Effects**

16         In lieu of any basis for alleging actual competitive harm, the Government's

17  "effects" allegations in this Complaint (Section V) rely instead on pleading "likely"

18  effects. But even assuming, *arguendo*, that a plaintiff may state a valid Section 1

19  claim using a standard of "likely" competitive effects, the Complaint's allegations fail

20  to even meet that standard. The Government attempts to allege "likely" competitive

21  effects by proceeding in stepwise fashion: first defining relevant antitrust markets,

22  Compl. ¶¶ 101-109, then relying on shares in those markets as a proxy for market

23  power, *id.* ¶¶ 114-19, and finally asserting "likely" harm from the alleged conduct, *id.*

24  ¶¶ 120-30. But this logic fails on at least two separate points: First, the Government

25  focuses on the wrong market—the *downstream* consumer market—and therefore fails

26  to plausibly allege the requisite market power over TWC in the *upstream* purchase of

27  video programming inputs, where the alleged competitive harm took place. And

28  second, because the communications alleged involved only the supposed sharing of

1    high-level, non-price information in a sporadic and non-systematic way, the conduct is

2    not sufficient to support an inference of either actual or "likely" competitive harm.  In

3    fact, if anything, the Complaint's allegations indicate that the market outcomes

4    complained of by the Government were the result of TWC's conduct, not any alleged

5    information exchange undertaken by DIRECTV.

6                    **a.      The Government Fails to Allege Market Power Over TWC in**
                            **the Relevant Market**
7

8            The antitrust concept of "relevant market" is critical here because, in order to

9    properly plead anticompetitive effects under the rule of reason, the plaintiff must allege

10   that the defendant(s) possessed and exercised market power in the market that is

11   *relevant* to the challenged conduct and the asserted anticompetitive effect.  *See Jacobs*

12   *v. Tempur-Pedic Int'l, Inc.*, 626 F.3d 1327, 1339 (11th Cir. 2010) (noting that the

13   plaintiff had to "define the relevant market and establish that the defendants possessed

14   power in that market" (citation omitted)); *see also Thurman Indus.*, 875 F.2d at 1373

15   ("Proving injury to competition ordinarily requires the claimant to prove the relevant

16   geographic and product markets and to demonstrate the effects of the restraint *within*

17   *those markets*." (emphasis added)).  Here, the Government's assertions of market

18   power are fundamentally flawed:  there is a logical mismatch between the core

19   antitrust theory alleged in the Complaint, on the one hand, and the asserted relevant

20   markets and related market power allegations, on the other.  This flaw amounts to a

21   failure to allege market power at all in any "relevant" market, which alone requires

22   dismissal of the Complaint.  *See Rick-Mik Enters. Inc. v. Equillon Enters. LLC*, 532

23   F.3d 963, 972 (9th Cir. 2008) ("A failure to allege power in the relevant market is a

24   sufficient ground to dismiss an antitrust complaint.").

25           The Government's Complaint describes two distinct levels of competition:

26   (1) the upstream level in which "[v]ideo distributors *acquire* the rights to transmit

27   video content from programmers," and (2) the downstream level in which video

28   distributors "then aggregate that content and *distribute* it to subscribers who pay for the

1    service."  Compl. ¶ 102 (emphasis added).  The purported restraints of trade in this

2    case allegedly resulted from bilateral distributor communications regarding

3    negotiations with TWC to acquire the Dodgers Channel as an input to their video

4    offerings.  For example, the Complaint repeatedly asserts that the alleged

5    communications related to "carriage plans" for the Dodgers Channel, *id.* ¶ 4, and

6    "information about [each MVPD's] content negotiations," *id.* ¶ 13.  The Complaint

7    further alleges that these communications affected "the competitive process for

8    carriage of the Dodgers Channel" and "the incentives . . . to negotiate for and carry the

9    Dodgers Channel."  *Id.* ¶ 126.  From a conduct perspective, the entire focus of this case

10   is upstream where the distributors who purchase program content negotiate with the

11   rights holder who licenses that content.

12        Yet, despite the Complaint's core allegation of anticompetitive conduct

13   occurring in connection with the upstream purchase of content, the Government

14   nowhere alleges a relevant market for the acquisition of programming by distributors.

15   Nor does it allege the market shares of DIRECTV or the other alleged co-conspirators

16   in such a market.  Perhaps most critically, the Government never alleges that any

17   combination of DIRECTV and one of the three other LA-area distributors alleged to be

18   involved in a bilateral information sharing agreement with DIRECTV had the requisite

19   market power over TWC necessary to impede the "competitive process" in

20   programming negotiations.  In the context of a "buyer-side conspiracy," the "market is

21   not the market of competing sellers but of competing buyers."  *Todd*, 275 F.3d at 202

22   (citation omitted).

23        Rather than focusing on the upstream market in which it alleges the

24   anticompetitive conduct occurred, the Complaint focuses in the wrong direction—*i.e.*,

25   on the downstream provision of pay-TV services to consumers.  It alleges product and

26   geographic markets for the sale of video service to consumers, and market shares as a

27   purported proxy for market power over those consumers.  *See* Compl. ¶¶ 102-19.  But

28   the fact that a local cable company has a high share of subscribers in parts of Orange

1   County or Long Beach does not support an inference of any ability to exercise market

2   power over TWC's sale of programming to LA-area distributors.  Appellate courts

3   have rejected such attempts to focus on the wrong level of distribution in the relevant

4   market analysis.  *See, e.g.*, *Twin City Sportservice, Inc. v. Charles O. Finley & Co.,*

5   *Inc.*, 512 F.2d 1264, 1272-73 (9th Cir. 1982) (the relevant market was the upstream

6   market in which a "concessionaire is a buyer," not a seller); *Todd*, 275 F.3d at 202

7   ("The district court's analysis reflects a failure to reverse all of the factors involved in

8   light of the buyer-side nature of the alleged activity."); *Dickson v. Microsoft Corp.*,

9   309 F.3d 193, 207 (2d Cir. 2002) (plaintiff "failed . . . to allege facts" regarding the

10  defendants' market share or power in the market logically implicated by its claims).[14]

11          Put simply, the Ninth Circuit has made clear that the relevant market for an

12  antitrust claim "must encompass the product at issue." *Newcal Indus., Inc. v. IKON*

13  *Office Solutions*, 513 F.3d 1038, 1045 (9th Cir. 2008).  Here, the product that was

14  allegedly affected by the alleged information exchange was the carriage rights for the

15  Dodgers Channel that TWC sought to license to DIRECTV and the other LA-area

16  MVPDs.  The Government's proposed relevant markets do not include that product,

17  and thus cannot be correct as a matter of law.

18          The consequence of the Government's omission and its focus on the wrong

19  market is that the Complaint provides no factual basis to support the assertion of

20  market power in the relevant (upstream) market.  As a result, the Complaint fails to

21  meet the minimum standards for pleading a plausible Section 1 rule of reason violation

22  because none of these distributors, individually or collectively, had the power to force

23  TWC to charge below-market prices for the Dodgers Channel.  The Government seeks

24  to make an entirely counter-intuitive inference:  that the failure of these distributors to

25  secure better licensing terms from TWC means that this Court ought to infer market

---

[14]  *See also Hanger v. Berkley Grp., Inc.*, No. 13-cv-113, 2015 WL 3439255, *3, *9 (W.D. Va. May 28, 2015) (addressing alleged buyer-side market and rejecting it as overly narrow because it failed to encompass all potential buyers of the service at issue).

Gibson, Dunn & Crutcher LLP

**DEFENDANTS' NOTICE OF MOTION AND MOTION TO DISMISS**, CASE NO. 2:16-cv-8150-MWF-E

power.  Indeed, the Department of Justice's own published guidelines suggest otherwise.  In analyzing joint purchasing, the Government has stated publicly that it is unlikely to raise antitrust concerns unless "the arrangement accounts for so large a portion of the purchases of a product or service that it can effectively exercise market power in the purchase of the product or service," which DOJ defines as "the power to drive the price . . . below competitive levels."  DOJ & FTC, *Statements of Antitrust Enforcement Policy in Health Care* (Aug. 1996), pp. 54-55, *available at* https://www.ftc.gov/sites/default/files/attachments/competition-policy-guidance/statements_of_antitrust_enforcement_policy_in_health_care_august_1996.pdf. Here, the buyer's market for the Dodgers Channel comprises, at a minimum, all of the distributors in the LA area, and the Government does not (because it cannot) allege that within that market DIRECTV and any other distributor it is alleged to have improperly shared information with have market power over TWC.  The absence of relevant market power allegations is fatal to a rule of reason claim that purports to rely on such circumstantial evidence of harm to competition.

> **b.   The Government Has Not Plausibly Alleged That the Challenged Conduct Is of the Sort Likely to Harm Competition**

In addition to the failure to plead market power in an appropriate relevant antitrust market, the conduct alleged in the Complaint is insufficient to plausibly suggest likely harm to competition.  The limited nature of the information exchange alleged indicates that it was unlikely to have any effect on the market.

The few agreements to exchange competitive information that have been found to violate the Sherman Act have invariably involved the systematic, sustained, and reciprocal exchange of current or future price information.  *See, e.g.*, *Container Corp.*, 393 U.S. at 335-36 (eight-year agreement to exchange "current pric[ing]" information "whenever requested"); *Todd*, 275 F.3d at 196-97 ("regular" exchange of detailed "current and future" employee salary and benefits information); *cf. Gray*, 469 F.2d at 745-47 (finding no liability where information sharing was not "systematic" and there

Gibson, Dunn &
Crutcher LLP

1   was no "reciprocal understanding").  As discussed above, the facts here miss on all of

2   these points:  the alleged communications were non-reciprocal, non-systematic, not

3   sustained, and involved no price information.  No court has found that such conduct

4   violates the Sherman Act.  It simply is not the type of conduct that risks a "genuine

5   adverse effect[] on competition."  *FTC v. Ind. Fed'n of Dentists*, 476 U.S. 447, 460,

6   106 S. Ct. 2009, 2018 (1986).

7        The Complaint is based, therefore, on a novel theory of antitrust law.  Inferring

8   "likely" competitive harm from such sporadic conversations about high-level, non-

9   price information would potentially expose all manner of business communications to

10  antitrust risk, with no limiting principle.  And most importantly, this novel theory

11  undermines the Supreme Court's finding in *Gypsum* that many information exchanges

12  are not just neutral, but pro-competitive.  *Gypsum*, 438 U.S. at 441 n.16.  It will leave

13  firms with little guidance as to when DOJ will characterize communications as an

14  improper "information exchange," creating uncertainty regarding where to draw the

15  line between permissible and unlawful communications.

16        **3.    The Complaint Fails to Plausibly Allege Causation**

17        The Complaint also fails to state a claim on an independent, alternative basis:

18  lack of causation.  The Complaint's suggestion that an isolated, sporadic exchange of

19  non-price information might have been the cause of the market outcome complained of

20  here, *i.e.*, the failure of TWC to reach any deals for Dodgers Channel carriage, is

21  belied by a much more obvious alternative explanation:  TWC's exorbitant prices and

22  bargaining intransigence.  This alternative explanation is not merely plausible under

23  the facts pled in the Complaint, but compelling.  Indeed, it is the *only* interpretation of

24  events that explains why both Verizon and DISH, neither of which is claimed to have

25  improperly shared information, also made the decision not to accept TWC's Dodgers

26  Channel licensing terms.  Compl. ¶ 108.

27        As the Ninth Circuit stated in *In re Century Aluminum*, "[w]hen faced with two

28  possible explanations, only one of which can be true and only one of which results in

1   liability, plaintiffs cannot offer allegations that are 'merely consistent with' their
2   favored explanation but are also consistent with the alternative explanation. . . .
3   Something more is needed . . . in order to render plaintiff's allegations plausible within
4   the meaning of *Iqbal* and *Twombly*." 751 F.3d at 1108 (citations omitted).  But
5   nothing in the Complaint suggests that it was the challenged information exchange,
6   and not TWC's excessive price demands, that resulted in the market impasse
7   complained of by the Government.  That alone requires dismissal because the alleged
8   effect on competition must be "caused by" the restraint of trade.  *Brantley*, 675 F.3d at
9   1200; *see also Treasure Valley Potato Bargaining Ass'n v. Ore-Ida Foods, Inc.*, 497
10  F.2d 203, 209 (9th Cir. 1974) (affirming dismissal of claim challenging agreement to
11  share price information where "the similarity of prices and contract terms" could be
12  explained by an alternative factor); *Int'l Norcent Tech. v. Koninklijke Philips Elecs.*
13  *N.V.*, No. CV 07-000043-MMM, 2007 WL 4976364, *15 (C.D. Cal. Oct. 29, 2007)
14  (granting motion to dismiss where "the causal connection between the hypothetical
15  restraint of trade and the injury to competition has been broken").

## V.   CONCLUSION

16
17      For the foregoing reasons, Defendants respectfully request that their Motion be
18  granted.  Further, given that the Government has already had more than a year of one-
19  sided "discovery" during its pre-complaint investigation without finding any evidence
20  to state a claim on these missing elements, the Complaint should be dismissed with
21  prejudice, as leave to amend would be futile.

22
23
24
25
26
27
28

Gibson, Dunn &
Crutcher LLP

**DEFENDANTS' NOTICE OF MOTION AND MOTION TO DISMISS**, CASE NO. 2:16-cv-8150-MWF-E

1    Dated:  January 10, 2017              Respectfully submitted,

2                                          GIBSON, DUNN & CRUTCHER LLP

3

4                                          By:  /s/ M. Sean Royall
                                                 M. Sean Royall
5
                                           Attorneys for Defendants
6                                          DIRECTV GROUP HOLDINGS, LLC,
                                           a Delaware Corporation,
7                                          AT&T INC.,
                                           a Delaware Corporation
8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28